# Exhibit A

**IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA**

JUN – 6 2018

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN THE MATTER OF:                         SUPREME COURT No. _18-0508_

THE HONORABLE ALLEN H. LOUGHRY II        JIC COMPLAINT NOS. 14-2018,

JUSTICE OF THE SUPREME COURT OF          17-2018, and 32-2018

WEST VIRGINIA

## FORMAL STATEMENT OF CHARGES

The West Virginia Judicial Investigation Commission ("Commission"), pursuant to Rules 2.7

(a) and (d) and 2.8 of the Rules of Judicial Disciplinary Procedure, has determined that probable

cause does exist to formally charge the Honorable Allen H. Loughry II, Justice of the Supreme Court

of Appeals of West Virginia ("Respondent," "Justice Loughry" or "Chief Justice Loughry") with

violations of the Code of Judicial Conduct and that formal discipline is appropriate based upon the

following probable cause findings:

1.      Respondent received his Juris Doctorate from Capital University School of Law. He also has

        a Masters of Law in Criminology and Criminal Justice from the University of London and a

        Masters of Law in Law and Government from American University's Washington College of

        Law. He also received a Doctor of Jurisdictional Science from American University's

        Washington College of Law.

2.      Respondent passed the February 1998 West Virginia Bar Examination. He became licensed

        to practice law in the State of West Virginia on or about February 24, 1998.  Respondent

        worked for the West Virginia Attorney General's Office from 1997 until 2003.  When he left,

        he held the rank of Senior Assistant Attorney General.  During his time there, Respondent

        served in both the Appellate and Administration Divisions and was appointed as a special

        prosecuting attorney on numerous occasions to handle criminal cases throughout West

        Virginia.  From May 2003 through December 2012, Respondent worked for the State

        Supreme Court as a law clerk.

3.   In November 2012, Respondent was elected to a 12-year term as a Justice of the State Supreme Court and took office on January 1, 2013. His term is set to expire on December 31, 2024. At all times relevant to the proceedings set forth below, Respondent was on inactive status from the practice of law, as is required whenever serving as a justice of the State Supreme Court. However, Respondent is still subject to the West Virginia Rules of Professional Conduct.

4.   From January 1, 2017, until February 16, 2018, Respondent served as Chief Justice of the State Supreme Court. Beginning on January 1, 2017, Respondent began serving the customary one-year term as Chief Justice. On April 5, 2017, the Court voted to change its rules to provide for the Chief Justice to serve a four-year term and to allow him/her to be re-elected to subsequent four-year terms by a majority vote. On that same day, a majority of the Court then selected Chief Justice Loughry to serve in that role for a full four-year term.

5.   On February 16, 2018, the majority of justices voted to remove Justice Loughry as Chief Justice.

6.   On February 16, 2018, Judicial Disciplinary Counsel filed Complaint No. 14-2018 against Respondent. Complaint Nos. 17-2018 and 32-2018 came in from members of the public on February 20, 2018, and April 2, 2018. By letter dated February 20, 2018, Judicial Disciplinary Counsel requested a response to Complaint Nos. 14-2018 and 17-2018 within ten business days. Respondent, by and through his attorney, requested and was granted a continuance to respond to March 16, 2018. His attorney was then granted a second continuance to mid-April 2018. On or about April 26, 2018, Respondent was given until May 14, 2018 to answer all three complaints and was further advised that no more continuances would be granted. By letter dated May 14, Respondent declined to submit a response within the time period requested citing certain reasons.

7.  After investigating and evaluating the Complaint, the Judicial Investigation Commission finds that there is probable cause to make the following **CHARGES** and **FINDINGS**:

**CHARGES I – XII[1]**

**The Commission finds that there is probable cause to believe that Justice Loughry violated Rules 1.1 (Compliance With the Law), 1.2 (Confidence in the Judiciary), 1.3 (Avoiding Abuse of the Prestige of Judicial Office), and 2.4(A) and (B) (External Influences on Judicial Conduct) of the Code of Judicial Conduct in effect since December 1, 2015, and Rules 8.4(a), (b), (c), and (d) (Misconduct) of the Rules of Professional Conduct as set forth in the attached Appendix when he made the following false statements with the deliberate intent to deceive, engaged in sophism, and gave disinformation with the intent to harm another person.**

8.  Respondent's Supreme Court office at the capitol was renovated in 2013. The total cost of the renovation was approximately $363,000.00, which included but was not limited to approximately $32,000.00 for a large blue suede sectional sofa, $1,700.00 for throw pillows, $7,500.00 for a custom-made wooden medallion of the State of West Virginia built into the floor with each county cut from a different colored piece of wood and his home county of Tucker in blue granite, $16,374.00 for eight chairs, $2,560.00 for a coffee table, and $6,409.00 for window cornices and blinds.

9.  A multitude of State Supreme Court records demonstrate that Respondent was heavily involved in the design and renovation of his office. For example, Respondent submitted a rough hand drawing with detailed notes done by him depicting how he would like his office to look upon completion. Importantly, the drawing contained the floor medallion. Respondent also received a detailed estimate of the construction costs for his chambers with an email message scheduling a meeting to go over the estimate. The records reveal that

---

[1] Each of Respondent's lies about his knowledge of the design and renovation of his office outlined below constitutes a separate charge and each Code violation is alleged for each charge.

Respondent attended that meeting and scheduled a follow-up appointment with the contractor. Respondent was also sent shop drawings for custom wood cabinets and office woodwork with a separate construction estimate. Emails also demonstrate that it was Respondent who selected the hardware for his cabinetry. He also sent a detailed email message to explain exactly how the inlaid medallion should appear on the floor. Witnesses observed Respondent visiting his office on a weekly basis while the renovations were underway to view the progress. Respondent also received updates on the project approximately twice each week from an onsite employee of Neighborgall, the construction company handling the renovation. Concerning the couch, Respondent personally selected the sectional. He also selected the blue suede fabric covering for the couch and the fabric covering the throw pillows. Additionally, former Administrative Director Steve Canterbury informed him about the price of the couch with the fabric upgrade because he was concerned about what the public might think if the price were released. According to Mr. Canterbury, Respondent authorized the purchase despite knowing the price.

10.     Beginning on or about November 14, 2017, WCHS-TV began a multi-part series into the spending practices of the State Supreme Court on its Waste Watch news segment. One of the topics discussed was the design and renovation of Respondent's Supreme Court office and the purchase of various items set forth in Paragraph No. 6 above. Subsequently, other news media throughout the State produced similar stories on the Supreme Court spending practices including items about the design and renovation of Respondent's office.

11.     In preparation for the initial story, Respondent agreed to be interviewed by Reporter Kennie Bass. In the portion of the interview that aired on television, Respondent clearly lied three times to Mr. Bass and the public about his level of involvement in the design and renovation of his office:

Mr. Bass:        [W]hy is there a couch that costs more than $30,000 in your chambers?

Respondent:    Kenny, it's absolutely outrageous that the prior administrative director would spend that much money on a couch with state money. I think it's outrageous and it's shameful.

Mr. Bass:        [H]ow much input did you have in the renovations and the furnishing of your office?

Respondent:    Well, very little. I mean when I came into the office, the renovations were a part of six and a half years of renovations, the first, third and fourth floors. More than 96 percent of those renovations were completed by the time it came to my office. Mr. Canterbury [the former Court Administrator] put things together and asked for approval of, maybe do you like this desk or do you like this color or something like that.

                      . . .

Mr. Bass:        So to be clear, you did not select that couch and you did not mandate the $20-some thousand in fabric changes for that couch?

Respondent:    Absolutely outrageous. The answer is no.

12.    In the unaired portions of the interview with Mr. Bass, Respondent lied on three more occasions to the reporter:

Mr. Bass:        There's a wood design on your floor that we've talked, ad nauseam, about that added cost. Why were things like that added in a private office? I mean it's not the cultural center. I've talked to you about it. It's not the capitol. It's nice but it seems like it's excessive and extra for a private office.

Respondent:    Mr. Canterbury was in charge of the renovations starting in – I started as Justice on this court in January of 2013. He started the renovations around 2007, 2008. They went on for quite some time. And he was very much excited about trying to work on all of these offices and he spent a lot of time on these things. I think the floor is certainly very nice. I think the price of the floor in my office is commensurate with the price of the floors in all of the other offices with the exception of one, which is actually more, but Mr. Canterbury was in charge of these expenditures.

Mr. Bass:        Did you have veto power? To borrow an executive phrase, did you have -- or did you not know or how did this happen?

| | |
|---|---|
| Respondent: | Oh, we had no idea the cost of these furnishings.  We would ask Mr. Canterbury, "How much is this?" Because I am very frugal.  Kenny, I live in an 1,100 square foot house.  I'm very frugal.  And I think that all elected officials should look at any expenditures as if it's coming out of your own pocketbook, your own checkbook.  That's the way you should do things.  The Court hired Mr. Canterbury in 2005, many years before, I guess, approximately eight years before I came to the Court.  He was in charge of the renovations, in charge of these expenditures and he, clearly as we've discovered, was involved with some excessive spending. |
| Mr. Bass: | He—in our interview with him, he said you were going to blame him for the expenditures.  And his defense, his reasoning was, well, that was my boss, what was I supposed to do?  The boss told me to do something and I did it.  Is that a correct characterization of what happened? |
| Respondent: | Absolutely not. . . . It's just not true at all. Again, Mr. Canterbury is a disgruntled, fired employee.  He threatened court members on the way out the door.  He's trying to set this up to damage the Court, damage individual members of the Court for some future lawsuit. |

13. On or about February 13, 2018, WCHS aired a story challenging the truthfulness of Respondent's statements in the November 2017 interview.  The television station gave Respondent an opportunity to address and/or correct his earlier statements. By email dated the same day and sent at approximately 11:45 a.m., the Court's Public Information Officer on behalf of Respondent stated, "Chief Justice Allen H. Loughry II said, 'I stand by my prior statement that I had no knowledge of the outrageous and inflated expenditures on furniture items such as the couch. Any insinuation to the contrary is simply dishonest.'"

14. Meanwhile, on November 15, 2017, Respondent gave a radio interview to Hoppy Kercheval on his morning show on the statewide WV Metro News Radio Network.  Respondent lied three more times during that interview about his level of involvement in the design and renovation of his Court office:

| | |
|---|---|
| Mr. Kercheval: | What role did you play in choosing a couch that cost $32,000? |
| Respondent: | Steve Canterbury, the prior administrative director of this court was solely responsible for a $32,000 couch. |

. . .

| | |
|---|---|
| Mr. Kercheval: | Let me ask you about another spending item, though. The special wooden medallion-type floor that is in your office . . . That cost $7,500. Now, that's on you isn't it? |
| Respondent: | Well, not entirely. . . [The medallion] was something that I had discussed with Mr. Canterbury. And I thought it would be an interesting idea. He spearheaded it. He told me that it cost virtually nothing. I continued to press on that, and at some point, he said $2,100. |

. . .

| | |
|---|---|
| Mr. Kercheval: | I want to ask you one other thing. And I'm going to ask this question by saying "Allen" because I've known you for years. . . . I quote you frequently because you wrote the book, which I have as my bible – small "b" – on political corruption in West Virginia. . . . I refer to it all the time. And you ran, used public financing, just Allen from Tucker County. . . . [I]f all you say to me is so, but a floor with the State of West Virginia with the marble Tucker County, isn't that a little ostentatious for the Allen Loughry I know. |
| Respondent: | Well, the floor -- well, the – Tucker County different color was a, quote, Steve called it a "lovely surprise" for me. Steve would spend money like it was his own, like it was his personal checkbook. And it wasn't his personal checkbook. You know, and it is Allen from Tucker County. And while I may be the Chief Justice, I am a citizen of this state and I am a taxpayer of this state and every bit of furnishing in my home and my parents' home and probably my in-laws' home wouldn't total $300- some thousand. But I am not talking the talk, Hoppy. When I had the opportunity, I fired Mr. Canterbury. And what I'm saying is we are continuing this investigation and the chips will fall where they may. |

15. Respondent wrote an opinion-editorial ("op-ed") piece which appeared in many newspapers throughout the state on or about December 21, 2017. The piece was entitled "Allen H. Loughry: Citizens Deserve Whole Story on Court Spending." Respondent also lied about his level of involvement in the design and renovation of his office and blamed the wasteful spending entirely on former Administrative Director Steve Canterbury. Respondent stated:

> Mr. Canterbury was not left with unfettered authority. He had strict spending limitations of $20,000. That rule has been in place since 2009 when it was introduced by and later signed by Mr. Canterbury. Any expenditure above the limit has to be presented to the full Supreme Court for a vote by the

majority.  That brings us to the $32,000 couch.  This item, along with other expenditures above the administrative director's $20,000 limit was never brought before the court for approval.  This is a clear violation of court rules and in my opinion is a misappropriation of state money.  If you don't have the legal authority to spend it, you can't spend it.  I am so deeply troubled by the amounts of some of these everyday items. . . . The waste comes in when Mr. Canterbury spent ridiculous and inexcusable amounts of money without approval or legal authority on some of the furnishings.  Why didn't I know?  Didn't I ask? After all, isn't Mr. Canterbury an employee of the court accountable to us justices? These are simple questions.  But the fact is I worked for years trying to get information from Mr. Canterbury, but I was in the minority, and making him answer my questions was a near impossibility. . . . I want to change the culture and perception of corruption that has plagued our government for countless generations.  While I am the chief justice, I am also a taxpayer of this state and I simply will not stand for excessive and wasteful spending.  The citizens of West Virginia deserve the whole story.  I will do my part to ensure that the appropriate people are held responsible.

16.     On January 12, 2018, Respondent appeared before the West Virginia House of Delegates Committee on Finance to answer questions about the Court's budget request for the fiscal year beginning July 1, 2018. Respondent was placed under oath prior to the beginning of his presentation. In his opening remarks, Respondent spoke briefly about recent revelations of profligate spending to renovate and furnish his office among others at the Supreme Court.  In response to a question by the Committee Vice Chairman Delegate Householder, Respondent again lied about his level of involvement and knowledge in the design and renovation of his office:

| Vice Chairman: | I was going to ask.  So, you don't think you the fox guarding the hen house? |
|---|---|
| Respondent: | Absolutely not. . . . |
| Vice Chairman: | Well, you know, there is a lot of public pressure from this body to do something because I don't think that you would dispute that it was outrageous.  There were a lot of claims.  I mean, the average taxpayer, they're outraged.  What they, from what was reported, so, we want to make sure that there are some safeguards or assurances that this will not happen again. |
| Respondent: | I think that is an absolutely legitimate concern and question.  There's nobody more outraged by these purchases than me. |

8

Many people in this room have known me for more than two decades, and they know I would have never approved of such things. . . .

17. W. Va. Code § 4-1-6 provides that [t]he presiding officer or clerk of either house may administer . . . the oath to any witness to be examined before such house or its committee or before any joint committee." The statute further provides that "[w]hen any committee of either house, or joint committee, is authorized to examine witnesses, or to send for persons and papers, the chairman of such committee, or in his absence any member thereof may administer the oath to any witness produced to testify before it."

18. Lying under oath before a committee of the legislature constitutes the crime of false swearing set forth in W. Va. Code § 61-5-2 which provides:

> **To willfully swear falsely, under oath or affirmation lawfully administered,** in a trial of the witness or any other person for a felony, concerning a matter or thing not material, and **on any occasion other than a trial for a felony concerning any matter or thing material or not material, or to procure another person to do so, is false swearing and is a misdemeanor.**

(emphasis added).

### CHARGE XIII

The Commission finds that there is probable cause to believe that Justice Loughry violated Rules 1.1 (Compliance With the Law), 1.2 (Confidence in the Judiciary), 2.5(A) and (B) (Competence, Diligence, and Cooperation), and 2.6(A) (Ensuring the Right to be Heard) of the Code of Judicial Conduct in effect since December 1, 2015, as set forth in the attached Appendix, when he kept secret from the other justices that in early December 2017 a federal subpoena was served on the "Supreme Court of Appeals of West Virginia" and was returnable in early January 2018.

19. Article VIII, § 8-1 of the West Virginia Constitution vests the judicial power of the state in part in "a supreme court of appeals" . . . and "in the justices . . . of such courts." Article VIII,

§ 8-2 mandates that the State Supreme Court "shall consist of five justices." The provision also states that "[a] majority of the justices of the court shall constitute a quorum for the transaction of business." The provision also requires "the selection of a member of the court to serve as chief justice." Article VIII, § 8-3 sets for the duties of the Court as a whole, which are all encompassing and include but are not limited to "general supervisory control over all intermediate appellate courts, circuit courts and magistrate courts." The provision states that the "chief justice shall be the administrative head of all courts" but limits his/her authority to the ability to "assign a judge from one intermediate appellate court to another, from one circuit court to another, or from one magistrate court to another for temporary service." It also gives the Court, as a whole, the authority to select an administrative director who shall, "under the direction of the chief justice, prepare and submit a budget for the court."

20.  W. Va. Code § 51-1-1, *et seq.,* also addresses the duties of the State Supreme Court and its Administrative Director. The statute mandates that "the Supreme Court of Appeals shall consist of five justices. . . . any three of whom shall constitute a quorum." W. Va. Code § 51-1-2 states that the Court "shall designate one of its justices to be chief justice of the court for such term as the court may determine. . . ." This provision does not list any duties or obligations of the Chief Justice nor do any of the remaining sections in the article. Instead, the majority of the articles relate to the duties and obligations of the Court as a whole. W. Va. Code § 51-1-15 requires the Court to select an administrative director, and W. Va. Code § 51-1-17 sets forth the duties of the position. Importantly, the latter provision states that "[t]he director shall, when authorized by the Supreme Court of Appeals, be the administrative officer of said court and shall have charge, under the supervision and direction of the Supreme Court of Appeals. . . ."

21. Respondent acknowledged the importance of a cohesive Court in his radio interview with Hoppy Kercheval when he said, "Well, people think the Supreme Court, and they think of five justices in Charleston." He again noted it in his December 2017 op-ed piece when he said, "The Supreme Court consists of five justices and it takes three votes to take such an action."

22. Based upon information and belief, in early December 2017, a federal subpoena was served on the State Supreme Court. The subpoena was addressed to the "Supreme Court of Appeals of West Virginia" and was returnable in early January 2018. Respondent, who was Chief Justice at the time, knew of the subpoena as did the Administrative Director and the then General Counsel for the Administrative Division. Respondent never informed the other justices of the subpoena, even though it may have sought items specific to one or more of the members of the Court. Importantly, the justice(s) had a clear right to challenge the subpoena in court pursuant to Rule 17 of the Federal Rules of Criminal Procedure, but obviously could not if they were unaware of its existence.

23. Based upon information and belief, the Court received another federal subpoena in February 2018. Once again, Respondent knew of the subpoena as did the Administrative Director and the then General Counsel for the Administrative Division. On February 16, 2018, the other justices were made aware of the second federal subpoena. During a conversation about it, the General Counsel let slip that there had been a previous subpoena issued in December 2017. Because of this important development the other justices lost trust in Respondent as Chief Justice and removed him from office later that day by a vote of four to one. The sole vote for retention came from Respondent.

**CHARGE XIV**

**The Commission finds that there is probable cause to believe that Justice Loughry violated Canons 1 (Integrity of Judiciary), 2A (Avoiding Impropriety and the Appearance of**

Impropriety), 2B (Avoiding Abuse of the Prestige of Judicial Office), 3C(1) (Administrative

Responsibilities), and 4A(2) and (3) (Extra-Judicial Activities) of the former Code of Judicial

Conduct in effect from January 1, 1993, to November 30, 2015, and/or Rules 1.1 (Compliance

With the Law), 1.2 (Confidence in the Judiciary), 1.3 (Avoiding Abuse of the Prestige of

Judicial Office), 2.4(A) and (B) (External Influences on Judicial Conduct), 2.12(A) and (C)

(Supervisory Duties), and 3.1(A), (C), and (E) of the current Code of Judicial Conduct which

went into effect on December 1, 2015; and Rules 8.4(a), (b), (c), and (d) (Misconduct) of the

Rules of Professional Conduct as set forth in the attached Appendix when in December 2012,

without permission or knowledge of the other justices, he secretly had the valuable antique

Cass Gilbert executive desk moved from his law clerk office at the capitol to his home in

Charleston, WV. Respondent furtively returned the desk on November 30, 2017.

24.     W. Va. Code § 29-1-7(b) provides in pertinent part:

> With the advice and consent of the archives and history commission, in addition to the duties above set forth, the [museum] section **shall determine the whereabouts of and require the return of furnishings and objects missing from the capitol building and other state-owned or controlled buildings, including, but not limited to, furnishings chosen or purchased for the capitol by its architect, Cass Gilbert. No furnishings from the capitol may be sold or disposed of except pursuant to the provisions of article three, chapter five-a of this code. If furnishings originally designated as capitol building furnishings have been sold or otherwise disposed of without the requisite sale procedures, such furnishings shall be returned to the capitol** and, upon presentation of proof of the amount paid, the current owner shall be reimbursed for the cost of the furnishing less any appropriate depreciation or wear and tear.

(emphasis added).   This provision was enacted by the West Virginia Legislature in 1991 and

has never been amended.

25.     W. Va. Code § 5A-3-43 created a State Agency for Surplus Property.   W. Va. Code § 5A-3-

44 and 45 set forth the authority and duties of the State Agency for Surplus Property.

Pursuant to W. Va. Code § 5A-3-45(a), the State Agency for Surplus Property has the

"exclusive power and authority to make disposition of commodities[2] or expendable commodities[3] now owned or in the future acquired by the state when the commodities are or become obsolete or unusable or are not being used or should be replaced." The numerous methods of disposition are clearly outlined in the statute and include "[s]elling the commodities to the general public at the posted price or to the highest bidder by means of public auctions or sealed bids" or "[s]elling the commodities to the highest bidder by means of an Internet auction site approved by the director." *See* W. Va. Code § 5A-3-45(b) (6) and (7). Importantly, the statute makes absolutely no provision for an employee to take home a commodity such as a desk or a couch that is no longer being used by the state agency simply on a whim.

26.    While still a law clerk at the Court, Respondent used a Court-owned Cass Gilbert executive desk at the capitol. In December 2012, the Respondent, without the permission of the Court and without the knowledge of the Justices, had the Cass Gilbert executive desk moved from his law clerk office at the Capitol to his home in Charleston. The move clearly violated the fundamental tenets of W. Va. Code § 29-1-7(b).

27.    The move was performed by Young's Moving Service. The Court paid for the move along with other furniture that was taken to the Court warehouse. The Cass Gilbert desk remained in Respondent's small home office from December 2012 until November 30, 2017, in ongoing violation of W. Va. Code § 29-1-7(b).

28.    During normal work hours on November 30, 2017, Respondent and three court employees surreptitiously moved the desk from his house to the Court warehouse. They used a Court van to make the move. The plan called for Respondent's wife to call him at work after the

---

[2] Commodities means "supplies, material, equipment, contractual services and any other articles or things used by or furnished to a department, agency or institution of state government." *See* W. Va. Code § 5A-1-1(1).
[3] Expendable commodities mean "those commodities which, when used in the ordinary course of business will become consumed or of no market value within the period of one year or less." *See* W. Va. Code § 5A-1-1(7).

neighbors across the street left their house so no one would see the desk being moved out of his house. Once he received the call, Respondent rounded up the Court employees -- all of whom were already at work. The four then went to his house and moved the desk into the Court van. They then took the item directly to the warehouse and unloaded it there before returning to work.

**CHARGE XV**

The Commission finds that there is probable cause to believe that Justice Loughry violated Canons 1 (Integrity of Judiciary), 2A (Avoiding Impropriety and the Appearance of Impropriety), 2B (Avoiding Abuse of the Prestige of Judicial Office), 3C(1) (Administrative Responsibilities), and 4A(2) and (3) (Extra-Judicial Activities) of the former Code of Judicial Conduct in effect from January 1, 1993, to November 30, 2015, and/or Rules 1.1 (Compliance With the Law), 1.2 (Confidence in the Judiciary), 1.3 (Avoiding Abuse of the Prestige of Judicial Office), 2.4(A) and (B) (External Influences on Judicial Conduct), 2.12(A) and (C) (Supervisory Duties), and 3.1(A), (C) and (E) of the current Code of Judicial Conduct which went into effect on December 1, 2015; and Rules 8.4(a), (b), (c), and (d) (Misconduct) of the Rules of Professional Conduct as set forth in the attached Appendix when on June 20, 2013, Respondent had the blue-green leather couch moved from his Court office to his home in Charleston where it remained until November 28, 2017.

29.     Former Supreme Court Justice Joseph P. Albright took office in September 1995 and served continuously until he took medical leave in September 2008 and passed away on March 20, 2009. Justice Albright furnished his Supreme Court Office with furniture he brought with him to the Court including a blue-green leather couch. After his death, family members went to Justice Albright's chambers and took certain of his personal furniture with them but left behind the blue-green leather couch.

14

30.    On April 9, 2009, then West Virginia Governor Joe Manchin appointed former Justice
       Thomas E. McHugh to serve Justice Albright's unexpired term.  Justice McHugh served
       continuously until December 31, 2012.  While in office, Justice McHugh took over and used
       Justice Albright's chambers.  The blue-green leather couch remained in Justice McHugh's
       office and was used by him during his entire term of office.

31.    On January 1, 2013, Respondent officially took office.  He also took over the chambers used
       by Justice Albright and Justice McHugh.  At some point, Respondent decided that he no
       longer wanted the blue-green leather couch in his office.  He told then Court Administrator
       Steve Canterbury that since he was going to have a home office where he did the court's
       work it would be appropriate for him to take it home to that office.  On June 20, 2013, a
       holiday for all State employees including those working for the Court, Respondent had the
       blue-green leather couch moved from his office to his home in Charleston.  Young's Moving
       Service performed the move at the same time that the company also took some furniture to
       the Court warehouse.

32.    The blue-green leather couch remained in Respondent's home and was used in or near the
       living room area from June 20, 2013, until November 28, 2017.  It was the only couch in or
       near Respondent's living room.  Based upon information and belief, the blue-green leather
       couch was never used in Respondent's home office because the room was small and the item
       could not fit there.

33.    The move was prompted by an item that appeared in the November 26, 2017 Sunday political
       column of Phil Kabler, a reporter for the Charleston Gazette-Mail newspaper.  In that
       column, Mr. Kabler inquired as to the whereabouts of the blue-green leather couch:

              Meanwhile, the question circulating around the Capitol is, what happened to
              the blue-green leather couch that was in Justice Allen Loughry's office when
              he was sworn in back in December 2012? (If you search Google images,
              you'll find a picture of Loughry and his wife and son sitting on the couch in
              what was then his new office.) The couch was purchased for late Justice Joe

Albright, and apparently disappeared somewhere between the court and Surplus Property.

34.    During normal working hours on or about the afternoon of November 28, 2017, Respondent and three Court employees went to Respondent's house, loaded the blue-green leather couch into a Court-owned white van, and moved it to the Court warehouse. Neighbors observed the couch being placed into the van and took a picture of the event. The photograph thereafter circulated on the Internet.

35.    In an effort to hide his wrongdoing, Respondent contacted Justice Albright's widow and son that same day and asked them about the couch. Respondent, through the Court's Public Information Officer, later informed the press that both family members said they did not want the couch. Respondent also said after speaking with the son, "He told me he did not want the couch and for me to keep it." Respondent also claimed that the blue-green leather couch was "abandoned property."

36.    Abandoned or unclaimed property, as it is otherwise known, is governed by W. Va. Code § 36-8-1, *et seq.* Property is presumed abandoned if it is unclaimed by the apparent owner during a specific time frame set forth for the particular property. *See* W. Va. Code § 36-8-2(a). For example, property held by a court, government, governmental subdivision, agency or instrumentality, is presumed abandoned if it is unclaimed for one year after the distribution date. *Id.* "All other property" is presumed abandoned if it is unclaimed for "five years after the owner's right to demand the property or after the obligation to pay or distribute the property arises, whichever occurs first." *Id.* The statute provides:

> Property is unclaimed if, for the applicable period . . . , the apparent owner has not communicated in writing or by other means reflected in a contemporaneous record prepared by or on behalf of the holder, with the holder concerning the property or the account in which the property is held, and has not otherwise indicated an interest in the property. A communication with an owner by a person other than the holder or its representative who has not in writing identified the property to the owner is not an indication of interest in the property by the owner.

16

*Id.*

37.    A holder of property presumed abandoned must make a report to the administrator of the program. *See* W. Va. Code § 36-8-7. The administrator is the State Treasurer. The report must be verified and must contain among other things, a description of the property. *Id.* The report must be filed with the State Treasurer before the first day of November of each year and cover the twelve months next preceding the first day of July of that year. The holder of property presumed abandoned must send written notice to the apparent owner not more than 120 days or less than 60 days before filing the report. *Id.* W. Va. Code § 36-8-8 provides that upon filing of the report, the holder of the property presumed abandoned shall pay, deliver or cause to be paid or delivered to the State Treasurer the property described in the report as unclaimed. If no one makes claim to the abandoned property, the State Treasurer "within three years after the receipt . . . shall sell it to the highest bidder at public sale. . . ." and the purchaser "takes the property free of all claims of the owner or the previous holder and of all persons claiming through or under them." *See* W. Va. Code § 36-8-12.

38.    Based upon the foregoing, Respondent failed to follow the tenets of the Uniform Unclaimed Property Act and turn the blue-green leather couch over to the State Treasurer. Instead, he improperly converted the property for his own personal use.

39.    Alternatively, the couch was a gift given to the Court at the time Justice Albright's family left it there in 2009 and was in full use in chambers for more than four years thereafter by Justice McHugh and Respondent. At the time Respondent no longer wanted the blue-green leather couch in his chambers, the item should have gone to Surplus Property and been purchased by him from that agency pursuant to W. Va. Code §§ 5A-3-43 through 45 before he took it to his home for personal use.

## CHARGE XVI

The Commission finds that there is probable cause to believe that Justice Loughry violated Rules 1.1 (Compliance With the Law), 1.2 (Confidence in the Judiciary), 1.3 (Avoiding Abuse of the Prestige of Judicial Office), 2.4(A) and (B) (External Influences on Judicial Conduct) of the Code of Judicial Conduct in effect since December 1, 2015, and Rules 8.4(a), (c), and (d) (Misconduct) of the Rules of Professional Conduct as set forth in the attached Appendix when he gave disinformation to the Court's Public Information Officer for publication that it was the long-standing practice of the Court for Justices to have the opportunity to establish a home office with court-provided technology equipment and furniture to suit their respective needs.

40.     On or about November 28, 2017, as a defense to media scrutiny over the removal of the Cass Gilbert desk and blue-green leather couch from the Capitol to Justice Loughry's home, the Public Information Officer sent an email which stated: "[T]he Court has a longstanding practice of providing the Justices an opportunity to establish a home office, with Court-provided technology equipment (i.e. computers) and furniture to suit their respective needs." Importantly, the quote came verbatim from Respondent.

41.     In fact, the Court has no written policy concerning a home office for justices but does have a verbal policy which involves only computer equipment. This was confirmed by then General Administrative Counsel Christopher Morris in response to a FOIA request from Mr. Kabler. It was also substantiated by a separate FOIA response from Justice Davis who wrote:

> I have been a member of the Supreme Court of Appeals of West Virginia since December 16, 1996. For the past 21 years, since my time on the Court, I have never heard of or seen any verbal or written policy of providing the justices an opportunity to establish a home office with furniture supplied by the West Virginia Supreme Court. The Justices have been provided computers and printers for off-campus use. Justices also have been provided Court cell phones."

18

42. Justice Ketchum also responded in writing to the FOIA request stating that there was no written policy but that he was told the following: "[w]hen I came on the Court in January 2009, I was informed that the Court would provide me a home office." He later clarified to Judicial Disciplinary Counsel that he understood the home office only to mean computer equipment.

43. In an email to Respondent dated December 6, 2017, Justice Walker said, "Steve [Canterbury] told me in the fall of 2016 that the Court's practice was to provide a new justice with any computer equipment I needed for a home office."

44. Chief Justice Workman told Judicial Disciplinary Counsel that at the time of the FOIA response she had conferred with Justice Davis and both had agreed that there was no written policy and no verbal policy beyond computer equipment.

45. In a written memorandum to Justice Davis dated November 29, 2017, the Court's Finance Director stated:

> I am not aware, nor heard any mention of a policy (verbal or written) regarding state property kept at home offices of any Justices. The lack of written policies and procedures is an ongoing problem which has existed for some time. But in this case, I was not aware of even a verbal policy regarding home offices for the Justices. It was my understanding that the justices likely had laptops at their homes, but I was not aware of any other state property that was not kept on the premises.

46. In a November 30, 2017 written memorandum to Justice Davis, the Administrative Services Director stated:

> I have been unable to identify any written, historical and/or verbal policies or practices related to the provision of furniture or fixtures purchased or owned by the court for use at a justice's home. . . . I did not locate any records documenting that any used furniture items were moved from the Court's offices or from either of the Court's warehouses to a justice's home. . . . As director, I have not arranged to have new or used furniture or fixtures delivered to a justice's home.

## CHARGE XVII

The Commission finds that there is probable cause to believe that Justice Loughry violated Canons 1 (Integrity of Judiciary), 2A (Avoiding Impropriety and the Appearance of Impropriety), 2B (Avoiding Abuse of the Prestige of Judicial Office), 3C(1) (Administrative Responsibilities), and 4A(2) and (3) (Extra-Judicial Activities) of the former Code of Judicial Conduct in effect from January 1, 1993, to November 30, 2015, and/or Rules 1.1 (Compliance With the Law), 1.2 (Confidence in the Judiciary), 1.3 (Avoiding Abuse of the Prestige of Judicial Office), 2.4(A) and (B) (External Influences on Judicial Conduct), 2.12(A) and (C) (Supervisory Duties) and 3.1(A), (C) and (E) of the current Code of Judicial Conduct which went into effect on December 1, 2015; and Rules 8.4(a), (b), (c), and (d) (Misconduct) of the Rules of Professional Conduct as set forth in the attached Appendix when he had extra Court computers installed in his home for personal use by himself and/or his wife and/or son.

47.     In addition to the desktop computer and tablet at his Supreme Court office, in late 2012 or early 2013, Respondent had two new Supreme Court desktop computers valued between $800.00 and $1200.00 apiece, a new printer valued between $400.00 and $600.00, and a laptop installed at his house. One desktop and a printer were placed in Respondent's home office while the second desktop was located in or near the kitchen. Respondent also had at least one laptop.

48.     A Supreme Court network engineer set up local computer accounts for Respondent's wife and son on at least one of the computers. Based upon information and belief, one of the desktop computers was primarily used for personal reasons by Respondent and/or his wife and/or son. Specifically, the computer was used to store family photographs and play games. A network engineer went to Respondent's house on several occasions to service the computer:

Q.      What was the problem with it?

A.    A lot of times it would just be like maybe the hard drive was full, just – just general like computer use issues where, you know, the more you – you use one or certain things you may put on it may cause an issue.

Q.    Did you have occasion to view what was on the computer – off the kitchen area?

A.    Yes.

Q.    What, if anything, did you observe about it?

A.    I know they – they used it for like family photos, his son played a few – more than a few games on it.  I don't think he really used it that much, but you know, just your general family and kids' games type things.

. . . .

Q.    Okay.  Did he ever – did he ever make a comment about his wife or son playing on that computer?

A.    Not directly, not that I know of.  I mean I know that he asked about storage space for photos and there were a few times where it ran out of storage space. Mainly because some of the games.  They would get a little haywire, for lack of a better term to where they would consume a lot of space that they shouldn't have, so I'd just take care of that, get it working again.

. . . .

Q.    And so you took care of the computer when the games ate up too much space?

A.    Uh-huh.

Q.    What kind of games were on the computer?

A.    A lot of them were your – just things you would see on the internet, like the free games.  I mean there were quite a number of them.  The main one was Minecraft, but there were – they were a bunch of just random, free games that you would see online.

Q.    A bunch, five, ten?

A.    Definitely more than ten, but I'm pretty sure the main one there was Minecraft.

49.    The other justices either have just one Supreme Court desktop computer at their home and/or

used a laptop or tablet which they carried to and from work. Additionally, none of the other

21

justices had family members on local accounts on their Supreme Court home desktops/laptops.

50.    In response to a subpoena, Respondent submitted one of his home desktops to the Court's Information Technology Unit in February 2018. The unit took an image of the entire hard drive and returned the computer to Respondent. A review of the hard drive shows that the computer was used substantially and overwhelmingly for personal use and not Supreme Court business.

**CHARGES XVIII – XXX[4]**

**The Commission finds that there is probable cause to believe that Justice Loughry violated Canons 1 (Integrity of Judiciary), 2A (Avoiding Impropriety and the Appearance of Impropriety), 2B (Avoiding Abuse of the Prestige of Judicial Office), and 4A(2) and (3) (Extra-Judicial Activities) of the former Code of Judicial Conduct in effect from January 1, 1993, to November 30, 2015, and/or Rules 1.1 (Compliance With the Law), 1.2 (Confidence in the Judiciary), 1.3 (Avoiding Abuse of the Prestige of Judicial Office), and 3.1(A), (C) and (E) of the current Code of Judicial Conduct which went into effect on December 1, 2015; and Rules 8.4(a), (b), (c), and (d) (Misconduct) of the Rules of Professional Conduct as set forth in the attached Appendix when he used a State vehicle for improper personal use:**

51.    The State Supreme Court has a fleet of vehicles that are used by employees for business travel. During all relevant time periods set forth below, three of the fleet vehicles were used almost exclusively by the justices and the administrative director for travel. One of the vehicles, a 2007 Platinum Buick Lucerne, was utilized almost solely by Justice Ketchum from approximately January 9, 2012, until approximately June 15, 2016. A 2009 Mocha

---

[4] Each personal car use outlined below constitutes a separate charge and each Code violation is alleged for each charge.

Buick Lucerne and a 2012 Black Buick LaCrosse were shared by the other justices and the administrative director.

52.   During the relevant time periods set forth below, the State Supreme Court did not have formal written policies or procedures for the use of its State vehicles.  However, there is an internal reservation system that is used by staff members and justices.   Court security is in charge of the vehicle fleet and the internal reservation system.

53.   Beginning on January 1, 2013, through approximately September 2016, Respondent used either the Mocha Buick Lucerne or the Black Buick LaCrosse on multiple occasions. According to the reservation system, Justice Loughry signed one or the other of the cars out for a combined total of 212 days.  On some occasions, Respondent or someone on his behalf would note where he was going but on other occasions no destination was listed.  According to the reservation system, 148 days failed to list any destination.  Through Court calendars, Respondent's personal calendar, gas logs, car mileage logs, transponder logs, travel records, car maintenance records, and witness statements, Judicial Disciplinary Counsel was able to substantiate the following instances where Respondent used a State vehicle for improper personal use:

a.   On Friday, August 23, 2013, Respondent used one of the vehicles, but no valid business destination could be discerned from the reservation system, the Court calendar, or Respondent's personal calendar;

b.   On Wednesday, November 27, 2013, through Thursday, November 28, 2013 (Thanksgiving), Respondent used one of the vehicles, but no valid business destination could be discerned from the reservation system, the Court calendar, or Respondent's personal calendar.

c.   On Friday, December 13, 2013, through Monday, December 16, 2013, Respondent used one of the vehicles, but no valid business destination could

be discerned from the reservation system, the court calendar, or Respondent's personal calendar.  However, Respondent's personal calendar indicates that he went to a "book signing" from "1-3" at the "Greenbrier" on "12/14;"

d.  On Friday, December 20, 2013, through Thursday, January 2, 2014, Respondent used one of the vehicles, but no valid business destination could be discerned from the reservation system, the court calendar, or Respondent's personal calendar.   Respondent's personal calendar states "12/22 WVU v. Perdue 1 pm.," "12/24 Mom's appt.," "12/31 Mom's appt. (2)," and "1/2/14 return car."  Respondent's mother and father live in Tucker County, and based upon information and belief, Respondent also owns a home there;

e.  On Tuesday, January 28, 2014, through Wednesday, January 29, 2014, Respondent used one of the vehicles, but no valid business destination could be discerned from the reservation system or the court calendar.  Respondent's personal calendar indicated a mixed business and personal use.  Specifically, Respondent's personal calendar states "1/28 Arg.," "1/29 TC Courthouse – magistrates/UJA-Security issues 10:00/Dad's hearing."  Records obtained by Judicial Disciplinary Counsel show that Respondent's father was the named defendant in a civil action in Tucker County Magistrate Court.  The case was styled *Master's Pest Management, LLC v. Loughry*, Tucker County Magistrate Case No. 13-M47C-00170. The matter was set for hearing on January 29, 2014.  Respondent accompanied his father to the hearing.  Based upon information and belief, the plaintiff also appeared for hearing.  The Civil Judgment Order dated the same day indicates that the claim against Respondent's father was dismissed;

f.  On Friday, March 21, 2014, through Sunday, March 23, 2014, Respondent used one of the vehicles but no valid business destination could be discerned from the reservation system, the Court calendar, or Respondent's personal calendar. Respondent's personal calendar stated "3/22 Greenbrier Book Signing 11:00 am;"

g.  On Wednesday, December 10, 2014, through Monday, January 5, 2015, Respondent used one of the vehicles, but no valid business destination could be discerned from the reservation system or the Court calendar. Respondent's personal calendar indicated a mixture of business and personal use. A pertinent notation to Respondent's personal calendar states "12/20 1:00-3:00 Greenbrier Book Signing overnight to Parsons;"

h.  On Friday, March 13, 2015, through Monday, March 16, 2015, Respondent used one of the vehicles, but no valid business destination could be discerned from the reservation system, the Court calendar or Respondent's personal calendar. Respondent's personal calendar stated "3/14 1-3 Greenbrier Book Signing meet GC Legislative Session Adjourns;"

i.  On Monday, August 3, 2015, through Friday, August 7, 2015, Respondent used one of the vehicles, but no valid business destination could be discerned from the reservation system or the Court calendar. Respondent's personal calendar indicates a mixture of business and personal use. Respondent's personal calendar stated "8/4 to Parsons," and "8/5 7:45 Mom's knee appt. Grant Co. Courthouse -- Grant Free Press Bill."

j.  On Monday, November 23, 2015, through Wednesday, November 25, 2015, Respondent used one of the vehicles, but no valid business destination could be discerned from the reservation system or the Court calendar. Respondent's

personal calendar indicates a mixture of business and personal use. Respondent's personal calendar stated "11/24 Upshur Co. Courthouse overnight Parsons;"

k.  On Friday, December 11, 2015, through Monday, December 14, 2015, Respondent used one of the vehicles, but no valid business destination could be discerned from the reservation system or the Court calendar. Respondent's personal calendar indicates a mixture of business and personal use. Respondent's personal calendar states "12/11 Lewis Co. Courthouse overnight Parsons," and "12/14 Dad's Birthday;"

l.  On Friday, September 2, 2016 (Labor Day Weekend), Respondent used one of the vehicles, but no valid business destination could be discerned from the reservation system, the Court calendar, or Respondent's personal calendar. On Respondent's personal calendar, he simply listed "9/5 Holiday."

54.  In summer 2016, Justice Davis raised general concerns about car usage following media stories about another State agency. She gathered information about usage of the Court's vehicles. Responding to her request, the Director of Court Security said that it was standard practice to verbally ask where the car was being taken when the requestor failed to list a destination. The Director stated that "[t]he only person we can recall that failed to provide a destination when asked was Justice Loughry."

55.  In response to Justice Davis' concerns, Respondent, who has continually maintained that he is for transparency in state government, attempted to exempt justices from providing information on a fleet request form. The proposed policy was eventually tabled and never approved. Nonetheless, Respondent stopped using fleet reservations altogether in or around mid-September 2016.

56.   Based upon information and belief, Respondent again used one of the vehicles on or around December 24, 2016 (Christmas Eve). No valid business destination could be discerned from the reservation system, the court calendar, or Respondent's personal calendar.   However, Respondent's personal calendar stated "12/23 Parsons."   Additionally, during the early morning hours of December 24, Respondent purchased gasoline with a state gas card in Sutton -- either on the way to or from Parsons.

## CHARGE XXXI
## (PATTERN AND PRACTICE)

**The Commission finds that there is probable cause to believe that Justice Loughry engaged in a pattern and practice of lying and using his public office for private gain:**

57.   Respondent engaged in a pattern and practice of lying as evidenced by Charges I through XII and XVI set forth above.

58.   Respondent engaged in a pattern and practice of using his public office for private gain as evidenced by Charges XIV, XV, and XVII through XXX.

59.   Respondent engaged in a pattern and practice of improperly using Court employees to pursue agendas of personal gain and the cover-up thereof as set forth in multiple Charges above.

## CHARGE XXXII
## (AGGRAVATING FACTORS)

**The Commission finds that there is probable cause to believe that there are aggravating factors to the above-stated charges which include but are not limited to the following:**

60.   Respondent wrote and published a book entitled *Don't Buy Another Vote, I Won't Pay for a Landslide*. The book is a look at West Virginia's history of political corruption.

    a.   On page xxvii, Respondent explained his reasons for writing a book on corruption:

> Part of the driving force behind my decision to write this book is the fact that I am so outraged with my State's political corruption. The countless disgusting examples of politicians

violating the people's trust are not just embarrassing and disheartening but have completely shattered my confidence in my State's government. I considered the situation and decided that I had a choice, walk away from any thought of public service, which if performed by honest people is the most noble of all professions, or try in some way to do something about these problems. My choice was to put together the framework for reform for all West Virginians so that together we would be able to regain confidence in the system.

b. Respondent opined that judges should be held to the highest standard of conduct. On pages 294-295, Respondent stated:

Of all of the criminal politicians in West Virginia, the group that shatters the confidence of the people the most is a corrupt judiciary. It is essential that people have the absolute confidence in the integrity and impartiality of our system of justice. After all, they are the people elected to ensure that objectiveness and fairness prevails when other people break the law. They are also the same people sending many of the executive and legislative branch elected officials to jail for their misgivings. When the soundness of the judiciary is questioned, coupled with the corrupt activities of the other branches of government, how is the public ever to have any faith in State government?

c. Respondent repeatedly stated that public officials should be more answerable than the average person for their wrongdoing. On page 327, Respondent stated that "[t]here is no justifiable or rational reason to ever allow a corrupt politician who violates the trust of the entire State to merely walk away without any accountability for his or her actions." On page 483, Respondent said that "it is equally important for police officers, prosecutors, magistrates, judges and justices who violate the law to receive tougher penalties for their corrupt actions."

61. Respondent holds himself out as being extremely knowledgeable on issues of government and ethics. In his State Supreme Court biography, Respondent notes that he is a frequent speaker on issues of government and ethics reform. This information is also often listed in

press releases about him such as the April 5, 2017 announcement concerning his election to a four-year term as Chief Justice.

***

Justice Loughry is advised that he has the right to file responsive pleadings to the charges made against him not more than 30 days after service of the formal charges upon him by the Clerk of the Supreme Court of Appeals of West Virginia. Any such pleadings shall be filed with the Clerk of the Supreme Court of Appeals and the Office of Disciplinary Counsel. For good cause shown, the Office of Disciplinary Counsel may extend the time for filing such pleadings. *See* Rule 2.10 of the Rules of Judicial Disciplinary Procedure.

**STATEMENT OF CHARGES** issued this ___ day of June, 2018.

The Honorable Ronald E. Wilson, Chairperson
Judicial Investigation Commission

REW:tat/bjl

29

## IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

IN THE MATTER OF:                                SUPREME COURT No. _____
THE HONORABLE ALLEN H. LOUGHRY II                JIC COMPLAINT NOS. 14-2018,
JUSTICE OF THE SUPREME COURT OF                  17-2018, and 32-2018
WEST VIRGINIA

### APPENDIX

### WEST VIRGINIA CODE OF JUDICIAL CONDUCT

#### (December 1, 2015 to Present)

**Rule 1.1 – Compliance With the Law**

A judge shall comply with the law, including the West Virginia Code of Judicial Conduct.

**Rule 1.2 – Confidence in the Judiciary**

A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.

**Rule 1.3 – Avoiding Abuse of the Prestige of Judicial Office**

A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so.

**Rule 2.4 – External Influences on Judicial Conduct**

(A)     A judge shall not be swayed by public clamor or fear of criticism.

(B)     A judge shall not permit family, social, political, financial, or other interests or relationships to influence the judge's judicial conduct or judgment.

**Rule 2.5 – Competence, Diligence, and Cooperation**

(A)     A judge shall perform judicial and administrative duties, competently and diligently.

(B)     A judge shall cooperate with other judges and court officials in the administration of court business.

**Rule 2.6 – Ensuring the Right to be Heard**

(A)     A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law.

1

**Rule 2.12 – Supervisory Duties**

(A)     A judge shall require court staff, court officials, and others subject to the judge's direction and control to act in a manner consistent with the judge's obligations under this Code.

(C)     A judge shall not direct any court personnel to engage in any activity or perform any work not reasonably related to the official position or functions of the personnel.

**Rule 3.1 – Extrajudicial Activities in General**

A judge may engage in extrajudicial activities, except as prohibited by law or this Code. However, when engaging in extrajudicial activities, a judge shall not:

(A)     participate in activities that will interfere with the proper performance of the judge's judicial duties;

(C)     participate in activities that would appear to a reasonable person to undermine the judge's independence, integrity or impartiality;

(E)     Make use of court premises, staff, stationary, equipment, or other resources, except for incidental use for activities that concern the law, the legal system, or the administration of justice, or unless such additional use is permitted by law.

**WEST VIRGINIA CODE OF JUDICIAL CONDUCT**

**(January 1, 1993, to November 30, 2015)**

**Canon 1.  A judge shall uphold the integrity and independence of the judiciary.**

A.     An independent and honorable judiciary is indispensable to justice in our society.  A judge should participate in establishing, maintaining, and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved.  The provisions of this Code are to be construed and applied to further that objective.

**Canon 2.  A judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities.**

A.     A judge shall respect and comply with the law, shall avoid impropriety and the appearance of impropriety in all of the judge's activities, and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

B.     A judge shall not allow family, social, political, or other relationships to influence the judge's judicial conduct or judgment.  A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others

2

nor shall a judge convey or knowingly permit others to convey the impression that they are in a special position to influence the judge. . . .

**Canon 3.  A judge shall perform the duties of judicial office impartially and diligently.**

C.     Administrative responsibilities. – (1)  A judge shall diligently discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration, and should cooperate with other judges and court officials in the administration of court business.

**Canon 4.  A judge shall so conduct the judge's extra-judicial activities as to minimize the risk of conflict with judicial obligations.**

A.     Extra-judicial activities in general. – A judge shall conduct all of the judge's extra-judicial activities so that they do not:

(2)     demean the judicial office; or

(3)     interfere with the proper performance of judicial duties.

## WEST VIRGINIA RULES OF PROFESSIONAL CONDUCT

**Rule 8.4 Misconduct**

**It is professional misconduct for a lawyer to:**

(a)     violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b)     commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c)     engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d)     engage in conduct that is prejudicial to the administration of justice;

## IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

IN THE MATTER OF:                                  SUPREME COURT No. _____
THE HONORABLE ALLEN H. LOUGHRY II          ·    JIC COMPLAINT NOS. 14-2018,
JUSTICE OF THE SUPREME COURT OF                 17-2018, and 32-2018
WEST VIRGINIA

### RULE 2.8 NOTICE OF FILING OF
### FORMAL STATEMENT OF CHARGES

Comes now Judicial Disciplinary Counsel pursuant to Rule 2.8 of the Rules of Judicial

Disciplinary Procedure and on behalf of the Judicial Investigation Commission and provides notice to

The Honorable Allen H. Loughry, II, by and through his counsel, John A. Carr, Esquire, by facsimile

transmission, email, and United States Mail that on the 6th day of June, 2018, at 10:00 a.m., she  will

duly file the attached Formal Statement of Charges in the above-captioned matter with the Clerk of the

Supreme Court of Appeals of West Virginia by hand delivering the original and nine copies to the

Clerk's Office located at the Capitol Complex, Building One, Room E-317, 1900 Kanawha Boulevard

East, Charleston, West Virginia 25305.


Respectfully submitted,


Teresa A. Tarr, Counsel
WV Bar I.D. No. 5631
Judicial Investigation Commission
City Center East Suite 1200A
4700 MacCorkle Avenue SE
Charleston, WV 25304
(304) 558-0169

## IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

IN THE MATTER OF:  
THE HONORABLE ALLEN H. LOUGHRY II  
JUSTICE OF THE SUPREME COURT OF  
WEST VIRGINIA

SUPREME COURT No. _____  
JIC COMPLAINT NOS. 14-2018,  
17-2018, and 32-2018

### CERTIFICATE OF SERVICE

I, Teresa A. Tarr, Counsel for the Judicial Investigation Commission, do hereby certify that I served the Notice of Filing and a true and accurate copy of the Formal Statement of Charges on Respondent by placing the same in the United States mail first-class postage pre-paid and addressed as follows: **John A. Carr, Esquire, Counsel for Respondent, 179 Summers Street, Suite 209, Charleston, WV 25301 [Telephone No. (304) 344-4822-office or (571) 259-6796-cell]; by facsimile transmission to (304) 414-2266; and by email to jcarr@jcarrlaw.com** on this the 5th day of June 2018.

Teresa A. Tarr, Counsel  
Judicial Investigation Commission  
WV Bar I.D. No. 5631  
City Center East, Suite 1200 A  
4700 MacCorkle Avenue  
Charleston, WV 25304  
(304) 558-0169  
(304) 558-0169 – *fax*  
teresa.tarr@courtswv.gov