# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

ROBIN JEAN DAVIS,

    *Plaintiff*,

    v.

JIM JUSTICE, Governor; ROGER HANSHAW,
Speaker of the West Virginia House of Delegates;
JOHN OVERINGTON, Speaker Pro Tempore of the
West Virginia House of Delegates; DARYL
COWLES, Majority Leader of the West Virginia
House of Delegates; CHANDA ADKINS, GEORGE
AMBLER, WILLIAM ANDERSON, MARTIN
ATKINSON III, SAIRA BLAIR, BRENT BOGGS,
JIM BUTLER, MOORE CAPITO, ROY COOPER,
VERNON CRISS, MARK DEAN, FRANK DEEM,
JOE ELLINGTON, PAUL ESPINOSA, ALLEN V.
EVANS, ED EVANS, TOM FAST, MICHAEL
FOLK, GEOFF FOSTER, CINDY FRICH, MARTY
GEARHEART, DIANNA GRAVES, BILL
HAMILTON, DANNY HAMRICK, JASON
HARSHBARGER, KENNETH HICKS, JOSHUA
HIGGINBOTHAM, JORDAN HILL, RAY HOLLEN,
ERIC L. HOUSEHOLDER, GARY G. HOWELL, D.
ROLLAND JENNINGS, JOHN R. KELLY, KAYLA
KESSINGER, CHARLOTTE LANE, DANIEL
LINVILLE, SHARON LEWIS MALCOLM, JUSTIN
MARCUM, PATRICK MARTIN, ZACK
MAYNARD, PAT MCGEEHAN, CAROL MILLER,
RILEY MOORE, ERIC NELSON, JEFFREY PACK,
TONY PAYNTER, RODNEY A. PYLES, BEN
QUEEN, RALPH RODIGHIERO, MATTHEW
ROHRBACH, WILLIAM R. ROMINE, RUTH
ROWAN, JOHN SHOTT, KELLI SOBONYA, JOE
STATLER, AMY SUMMERS, TERRI SYPOLT,
JILL UPSON, DANNY WAGNER, GUY WARD,
STEVE WESTFALL, BRAD WHITE, S.
MARSHALL WILSON, MARK ZATEZALO,
members of the West Virginia House of Delegates;
STEVE HARRISON, Clerk of the West Virginia
House of Delegates; RYAN FERNS, Majority Leader

Case No. 2:18-cv-01316

Hon. Thomas E. Johnston

**MEMORANDUM IN SUPPORT
OF PLAINTIFF DAVIS'S
MOTION FOR PRELIMINARY
INJUNCTION**

of the West Virginia Senate; MIKE AZINGER,
ROBERT D. BEACH, CRAIG BLAIR, GREG
BOSO, CHARLES H. CLEMENTS, SUE CLINE,
ROBERT L. KARNES, KENNY MANN, MIKE
MARONEY, MARK R. MAYNARD, RICHARD
OJEDA, PATRICIA RUCKER, RANDY SMITH,
DAVE SYPOLT, TOM TAKUBO, JOHN R. UNGER
II, RYAN WELD, MIKE WOELFEL, members of the
West Virginia Senate; LEE CASSIS, Clerk of the
West Virginia Senate,

       *Defendants*.

## <u>TABLE OF CONTENTS</u>

INTRODUCTION.................................................................................................................1

FACTUAL BACKGROUND ..............................................................................................2

      A.    The Justices of the West Virginia Supreme Court of Appeals Came
           Under Attack. .........................................................................................2

      B.    The House of Delegates Impeached All Remaining Justices of the West
           Virginia Supreme Court of Appeals..........................................................3

      C.    The Senate Persists in Trying Justice Davis, Despite Her Retirement. ...........4

ARGUMENT .......................................................................................................................4

      I.    Justice Davis Is Likely to Succeed on the Merits. ................................................5

           A.    The Articles of Impeachment Are Factually Unfounded. ......................6

           B.    The Articles of Impeachment Are Procedurally Invalid.......................11

           C.    Continuing Impeachment Proceedings Against Justice Davis—
               Who Has Retired from the Bench—Is Improper..................................13

            D.    The Articles of Impeachment and Senate Proceedings on Those
               Articles Violate Both the Federal and State Constitutions. .................15

            E.    The Defendants Have No Immunity For Their Bad Faith Acts. .........22

      II.    Justice Davis Will Suffer Irreparable Harm If the Injunction Is Not
           Granted. .................................................................................................24

      III.    The Balance of the Hardships Favors the Injunction......................................26

      IV.    The Public Interest Favors the Injunction......................................................28

      V.    Waiver of Bond is Appropriate. ....................................................................28

CONCLUSION ..................................................................................................................29

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*ACLU v. Wicomico Cty.*,
  999 F.2d 780 (4th Cir. 1993) .................................................................21

*State ex rel. Barker v. Manchin*,
  279 S.E.2d 622 (W. Va. 1981) ..............................................................18

*Bd. of Educ. of Cty. of Mercer v. Wirt*,
  453 S.E.2d 402 (W. Va. 1994) ..............................................................12

*Beardsley v. Webb*,
  30 F.3d 524 (4th Cir. 1994) ..................................................................22

*BMW of N. Am., Inc. v. Gore*,
  517 U.S. 559 (1996) ..............................................................................18

*Bogan v. Scott-Harris*,
  523 U.S. 44 (1998) ................................................................................23

*State ex rel. Brotherton v. Blankenship*,
  207 S.E.2d 421 (W. Va. 1973) ..............................................................19

*Brown v. Griesenauer*,
  970 F.2d 431 (8th Cir. 1992) ................................................................23

*State ex rel. Carenbauer v. Hechler*,
  542 S.E.2d 405 (W. Va. 2000) ..............................................................20

*Centro Tepeyac v. Montgomery Cty.*,
  722 F.3d 184 (4th Cir. 2013) (en banc) ...............................................28

*Dadisman v. Moore*,
  384 S.E.2d 816 (W. Va. 1988) ..............................................................16

*Doe v. Pittsylvania Cty.*,
  842 F. Supp. 2d 927, 937 (W.D. Va. 2012) ..........................................29

*Dunn v. Town of Emerald Isle*,
  918 F.2d 955 (4th Cir. 1990) ................................................................16

*E.A. Hawse Health Ctr. v. Bureau of Med. Servs.*,
  2011 WL 4528492 (S.D.W. Va. Sep. 28, 2011) ...................................26

*Elrod v. Burns*,
  427 U.S. 347 (1976) ..............................................................................21

*Faulkner v. Jones,*
  10 F.3d 226 (4th Cir. 1993) .........................................................................26, 28

*State ex rel. Frazier v. Meadows,*
  454 S.E.2d 65 (W. Va. 1994) ..............................................................................19

*Gilliam v. Foster,*
  75 F.3d 881 (4th Cir. 1996) (en banc) ...............................................................27

*Golson v. Green Tree Fin. Servicing Corp.,*
  26 F. App'x 209 (4th Cir. 2002) .........................................................................17

*Hamling v. United States,*
  418 U.S. 87 (1974)...............................................................................................17

*Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.,*
  700 F. App'x 251 (4th Cir. 2017) .......................................................................25

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,*
  174 F.3d 411 (4th Cir. 1999) ..............................................................................28

*Int'l Union v. Consol. Energy, Inc.,*
  243 F. Supp. 3d 755 (S.D.W. Va. 2017) ...............................................................5

*Kamplain v. Curry Cty. Bd. of Comm'rs,*
  159 F.3d 1248 (10th Cir. 1998) ..........................................................................23

*Larsen v. Senate of Pa.,*
  152 F.3d 240 (3d Cir. 1998)................................................................................27

*Marfork Coal Co. v. Smith,*
  2010 WL 742560 (S. D.W. Va. Feb. 26, 2010) ..................................................24

*Marietta Mem. Hosp. v. W. Va. Health Care Auth.,*
  2016 WL 7363052 (S. D.W. Va. Dec. 19, 2016)................................................26

*Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.,*
  354 F.3d 249 (4th Cir. 2003) ..............................................................................28

*Pashby v. Delia,*
  709 F.3d 307 (4th Cir. 2013) ............................................................................5, 28

*Paul v. Davis,*
  424 U.S. 693 (1976)..............................................................................................16

*Pennhurst State Sch. & Hosp. v. Halderman,*
  465 U.S. 89 (1984)................................................................................................27

*State ex rel. Quelch v. Daugherty*,
  306 S.E.2d 233 (W. Va. 1983) ...................................................................18

*Republican Party of N.C. v. Martin*,
  980 F.2d 943 (4th Cir. 1992) .....................................................................22

*Robie v. Price*,
  2017 WL 3097529 (S. D.W. Va. July 20, 2017) .....................................25

*Rossignol v. Voorhaar*,
  316 F.3d 516 (4th Cir. 2003) .....................................................................21

*Saleh v. Upadhyay*,
  11 F. App'x 241 (4th Cir. 2001) ...............................................................21

*Sciolino v. City of Newport News*,
  480 F.3d 642 (4th Cir. 2007) .....................................................................16

*Shepard v. Irving*,
  77 F. App'x 615 (4th Cir. 2003) ...............................................................21

*Speiser v. Randall*,
  357 U.S. 513 (1958) ..................................................................................16

*State Farm Fire & Cas. Co. v. Prinz*,
  743 S.E.2d 907 (W. Va. 2013) ....................................................................9

*State v. Hasty*,
  63 So. 559 (Ala. 1913) ..............................................................................17

*Suarez Corp. Indus. v. McGraw*,
  202 F.3d 676 (4th Cir. 2000) .....................................................................21

*Tri Cty. Paving, Inc. v. Ashe Cty.*,
  281 F.3d 430 (4th Cir. 2002) .....................................................................16

*United States v. Brewster*,
  408 U.S. 501 (1972) ..................................................................................23

*Wisconsin v. Constantineau*,
  400 U.S. 433 (1971) ..................................................................................16

*Zimmeck v. Marshall Univ. Bd. of Governors*,
  2013 WL 5700591 (S. D.W. Va. Oct. 18, 2013) .....................................23

**Statutes**

W. Va. Code § 3-10-3 ...................................................................................3

W. Va. Code § 5-10A-1, *et seq.* ................................................................................15

W. Va. Code § 51-9-10 .............................................................................................9

**Other Authorities**

Administrative Order No. 10, May 19, 2017 .............................................................9

Brad McElhinny, *Justice Davis Announces Retirement from State Supreme Court, Amid Impeachment*, WV METRONEWS (Aug. 14, 2018, http://wvmetronews.com/2018/08/14/important-announcement-scheduled-at-supreme-court/) .............................................................................................25

Brad McElhinny, *Trial dates set for W.Va justices Loughry, Workman, Walker and Davis*, WV METRO NEWS (Sep. 11, 2018, http://wvmetronews.com/2018/09/11/updates-pretrial-hearing-in-wv-supreme-court-impeachment/) ...................................................................................14

11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2948.1 (3d ed. 2018) ...........................................................................................25

Dave Mistich, *Gov. Justice Appoints Armstead, Jenkins to West Virginia Supreme Court*, WV PUBLIC BROADCASTING (Aug. 25, 2018, http://www.wvpublic.org/post/gov-justice-appoints-armstead-jenkins-west-virginia-supreme-court#stream/0) ..................................................................3

Fed. R. Civ. P. 65 ...................................................................................................28

H.R. 201, 83rd Leg., 2nd Spec. Sess. (W. Va. 2018) ......................................11, 12, 13

H.R. 202, 83rd Leg., 2nd Spec. Sess. (W. Va. 2018) ...............................................13

Isaac Stanley-Becker, *The Entire W.Va. Supreme Court Faces Impeachment for Alleged Corruption: Gas Money, Restaurant Lunches, an Antique Desk*, WASH. POST (Aug. 10, 2018, https://www.washingtonpost.com/news/morning-mix/wp/2018/08/10/gas-money-restaurant-lunches-an-antique-desk-the-entire-w-va-supreme-court-could-be-impeached-for-corruption/?noredirect=on&utm_term=.0dc9e52c5ce3) .......................................25

W. Va. House Committee on the Judiciary R. P. 12 .................................................13

W. Va. Senate R. 31(b) ...........................................................................................14

*W. Virginia Supreme Court Impeached Over Spending*, VALLEY NEWS (Sept. 30, 2018, https://www.vnews.com/Lavish-court-spending-in-poor-West-Virginia-triggers-scandal-19490188) .............................................................................25

West Virginia Constitution ................................................................................................... *passim*

**INTRODUCTION**

In August 2018, the West Virginia House of Delegates engaged in an unprecedented abuse of power:  It voted to impeach all four Justices then sitting on the Supreme Court of Appeals of West Virginia, including Plaintiff Robin Davis.  The asserted grounds for impeachment of Justice Davis were:  (a) that, several years earlier, she had spent too much money on office renovations, (b) that, years earlier, she and another impeached Justice had improperly appointed senior judges to fill vacancies within the judiciary, and (c) that the Justices collectively had failed to establish adequate policies related to spending and reporting of expenses by members of the judiciary and staff.  The House had no factual or legal basis for impeaching Justice Davis on any of these charges.  The House knew that the information it had concerning certain of these charges was incomplete and that the legal basis for others was invalid.  What is more, the facts cited purportedly to support impeachment do not remotely rise to the level of impeachable conduct.  But the House was not interested in investigating whether the facts warranted impeachment.  Instead, it used these charges as a pretext to remove all four Justices on West Virginia's highest Court so that the Governor could replace the popularly elected Justices with Republican men and create a "conservative court" for years to come.

The House proceedings to date and the Senate trial that is being conducted of the Justices named in the Articles of Impeachment, including Justice Davis—even though she has now retired—are inadequate to protect former Justice Davis's compelling interest in the right to hold office and serve the citizens of West Virginia.  The Defendants must be enjoined from taking further action that degrades Justice Davis's rights under the Constitutions of both the state of West Virginia and the United States.  This Court should preliminarily enjoin the pending Senate trial of Justice Davis, which is scheduled to begin on October 29, 2018.

1

## FACTUAL BACKGROUND

### A.   The Justices of the West Virginia Supreme Court of Appeals Came Under Attack.

Justice Robin Davis has served the people of West Virginia as a Justice of the West Virginia Supreme Court for more than 20 years, since her election to the bench in 1996.  (Davis Decl. ¶ 2.)  She has been re-elected twice, most recently in 2012, and has at all times conducted herself ethically and honestly in service of the State.  Justice Davis, Menis Ketchum, Allen Loughry, Margaret Workman, and Elizabeth Walker served as the five Justices of the Supreme Court as of early 2018.

Beginning in 2017, the Court came under investigation for alleged ethical violations relating to spending, including on renovations to the Justices' offices, and other issues relating to improper use of court funds.  In early June 2018, following an exhaustive investigation into these charges, the Judicial Investigation Commission moved to have Justice Loughry suspended from the bench based on violations of West Virginia's codes of judicial conduct.  (Ex. A.) Subsequently, federal prosecutors indicted him on 22 criminal charges and he is set to stand trial in October 2018.  On July 11, Justice Ketchum announced his resignation (effective July 27); several weeks later, he pleaded guilty to one charge of federal wire fraud.  On July 23, the Commission cleared Justices Davis, Walker, and Workman of wrongdoing, announcing that it had concluded its ethics investigation and would not take any further disciplinary action.  (Ex. B.)

In the wake of these allegations of ethical improprieties, Governor Justice took the opportunity to secure political advantage in the one branch of State government in which a Democratic majority persisted.  Rather than pursuing impeachment of the one sitting Justice against whom impropriety had been asserted—Justice Loughry—Governor Justice issued a

proclamation convening the Legislature in extraordinary session to address "[m]atters relating to the removal of *one or more Justices* of the Supreme Court of Appeals of West Virginia, including, but not limited to, censure, impeachment, trial, conviction, and disqualification." (Ex. C (emphasis added).)  Later, he held a press conference at which he announced his commitment to building a "conservative court."[1]

### B.   The House of Delegates Impeached All Remaining Justices of the West Virginia Supreme Court of Appeals.

The House of Delegates willingly complied.  After investigation and hearings by the House Judiciary Committee,[2] the full House of Delegates convened on August 13, 2018 for hearings on more than a dozen Articles of Impeachment recommended by the Committee—and impeached *all four remaining Justices.*  The timing is significant.  The House convened to vote on impeachment exactly *85 days* before the November 6 general elections.  Under State law, any vacancy on the Court is eligible for special election if the next election is no less than *84 days* before the election.  Thus, if any Justice was removed as a result of impeachment, their seat would not be up for election in November 2018, and instead the Governor would be permitted to fill the seat for more than two years.  *See* W. Va. Code § 3-10-3(d).

After approximately 17 hours of debate, the House voted to impeach all four remaining Justices in various combinations—but not Justice Ketchum, who had previously retired—on 11 Articles, four of which were directed to Justice Davis.  (Ex. D.)  The Articles directed to Justice Davis alleged that (a) years earlier, she had engaged in "unnecessary and lavish spending" of approximately $500,000 for renovations of her judicial chambers, (b) years earlier, she had

---

[1] *See* Dave Mistich, *Gov. Justice Appoints Armstead, Jenkins to West Virginia Supreme Court*, WV Public Broadcasting (Aug. 25, 2018, http://www.wvpublic.org/post/gov-justice-appoints-armstead-jenkins-west-virginia-supreme-court#stream/0) ("Justice said he wanted the state to have 'without any question – a conservative court.'").

[2] Transcripts of the hearings held by the House Judiciary Committee and other relevant materials are available at http://www.wvlegislature.gov/impeachment_documents.cfm.

authorized compensation of Senior Status Judges in excess of a statutory limit, and (c) she did not, along with all of the other Justices, put in place certain policies related to spending and reporting of expenditures by members and staff of the West Virginia Judiciary.

### C.   The Senate Persists in Trying Justice Davis, Despite Her Retirement.

On August 13, before the House concluded its debate on the Articles of Impeachment, Justice Davis retired from the Supreme Court of Appeals so she could protect the rights of the citizens of West Virginia to vote for the Justices of the Supreme Court.  (Davis Decl. ¶ 3.)  She announced her retirement to the public the following morning.  Despite Justice Davis's retirement, the Senate is persisting in trying her—even though under express Rules, removal from office is the only available judgment against her.  The Senate has scheduled Justice Davis's trial to begin on October 29, 2018.

On August 25, Governor Justice appointed two interim Justices to fill the vacancies left by Justice Davis and Justice Ketchum until a special election on November 6, 2018, at which time the voters will elect replacements to serve out the remainder of the retired Justices' terms. One of those interim Justices is former House of Delegates Speaker Tim Armstead, a Republican, who had resigned his position as speaker only four days earlier to campaign for election to Supreme Court Justice.  Prior to his resignation, Speaker Armstead cast a vote to impeach all four remaining Justices of the Supreme Court of Appeals.  The other is Evan Jenkins, also a Republican, who formerly served in the United States House of Representatives but lost a bid for election to the United States Senate in spring 2018.  Governor Justice swore in both Armstead and Jenkins on September 25, 2018.

### ARGUMENT

Preliminary injunctive relief is appropriate when a plaintiff shows that: (1) she is likely to succeed on the merits; (2) she is likely to suffer irreparable harm in the absence of preliminary

relief; (3) the balance of equities tips in her favor; and (4) an injunction is in the public interest. *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013) (citing *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7 (2008)).  "In the case of a preliminary, as opposed to a permanent injunction, the evidentiary standard applied in determining whether a plaintiff has established all four necessary elements is substantially relaxed, given that the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Int'l Union v. Consol. Energy, Inc.*, 243 F. Supp. 3d 755, 756 (S.D.W. Va. 2017) (citation omitted).  Thus, although the plaintiff must make a "clear showing" of the basis for a preliminary injunction, she "need not [establish] a certainty of success" to prevail on her motion.  *Pashby*, 709 F.3d at 321.

## I.      JUSTICE DAVIS IS LIKELY TO SUCCEED ON THE MERITS.

Justice Davis will demonstrate that the impeachment proceedings that took place in the House, and the trial that is scheduled to occur in the Senate, are factually baseless and legally invalid.  Before impeachment proceedings began, the Judicial Investigation Commission—an independent entity formed for the purpose of investigating judicial misconduct—concluded that Justice Davis (as well as Justices Workman and Walker) had not engaged in any misconduct. The House plowed ahead despite this.  Through testimony provided in the impeachment proceedings, the House was made aware that the evidence before it that purportedly supported the stated grounds for impeachment was incomplete and inaccurate.  The House plowed ahead despite this.  Following its failure to investigate the facts, the House Judiciary Committee failed to make the factual findings required under its own rules, even in the face of objections from the Minority Chair of the Judiciary Committee.  The House plowed ahead despite this, and as a result, Justice Davis has never had notice of which facts supposedly support her impeachment. And in light of Justice Davis's retirement, the sole judgment authorized under the House and Senate Rules adopted specifically for these impeachment proceedings—removal from office—is

unavailable.  Yet the Senate continues to plow ahead, putting Justice Davis on trial to impose penalties beyond what the House's Articles of Impeachment and the West Virginia Constitution permit.

It is not surprising that the impeachment proceedings have been so fundamentally flawed. After all, the events of the last month and a half have not involved anything like the impeachment that the drafters of the West Virginia Constitution contemplated—*i.e.*, a determination after meaningful investigation that some State official has engaged in gross or criminal misconduct and should be removed before the end of his term for the protection of the public.  To the contrary, these Articles of Impeachment proposed to remove *every Justice remaining on the Supreme Court of Appeals*, citing as grounds supposed conduct that does not remotely rise to the level of "maladministration, corruption, incompetency, gross immorality, neglect of duty, or any high crime or misdemeanor."  W. Va. CONST. Art. IV, § 9.  Simply put, one branch of the State government sought to eliminate the entire leadership of another branch. Neither fact nor law could be expected to support such an unprecedented abuse of power—and neither fact nor law supports the actions taken here.  The Defendants' improper conduct stands in violation of both the federal and State Constitutions.

### A.    The Articles of Impeachment Are Factually Unfounded.

***Renovations.***  Article II states that Justice Davis spent "approximately $500,000" on "the renovation and remodeling" of her "personal office" (in fact, her chambers at the Supreme Court of Appeals), and declares that this constitutes a violation of her oath of office because the spending was "unnecessary and lavish."  (Ex. D.)  The record before the House, however, demonstrated *exactly the opposite*.

The Judiciary Committee heard testimony from Steven Canterbury, Administrative Director of the Courts of West Virginia, who explained that the "vast majority" of expenditures for renovation of Justice Davis's office were for ***necessary***, structural repairs:

> Q.     Okay.  As far as Justice Davis' office, there's been some reports of $498,000 to half a million dollars . . . on her office.  Was some of that structural, plumbing, HVAC, electrical?  Or is that basically all cosmetic, furniture?
>
> A.     No, it's almost—***the vast majority of it is structural.***  Her office—man, when they pulled those walls out and started to gut those interiors, it was downright scary.  The wire still had the original paper-covered wiring and the sockets were the old-fashioned kind.
>
>        The clay was crumbling, those clay tiles had crumbled.  They were not—they were being held up by their own weight.  There was no structure left.  Usually you get to a point, you can piggyback on—on more recent wiring.
>
>        That was able to be done in Justice Loughry's office because sometime in the previous 20 or 30 years apparently, they'd pulled reasonably modern wire.  But none of that could happen in Justice Davis' office. . . .  ***It all had to be redone.***

(July 26, 2018 Tr. at 1341-42 (emphasis added).)  Mr. Canterbury estimated that fully 75 percent of expenditures on Justice Davis's chambers were for necessary structural improvements.  (*Id.* at 1366-67 (noting that in one of the other areas of the Supreme Court of Appeals that, like Justice Davis's chambers, had never before been structurally renovated, "there was a telltale odor of electrical wires burning and ***something had to be done***") (emphasis added).)

Mr. Canterbury's estimate was later confirmed by a report issued by the Legislative Post Audit Division on September 7.  (Ex. E.).  Notably, although the House was aware that the audit review was still in process during the impeachment proceedings (*see, e.g.*, July 27, 2018 Tr. at 1602), it did not wait for the results to enter the Articles of Impeachment.  In fact, when the report was issued, it showed that only about 20% of the expenditures on Justice Davis's chambers went to items like "décor" and "furniture," while more than 75% went to "infrastructure," "fixtures," "flooring," and "painting."  (Ex. E at 14.)

In short, the evidence before the House (and the evidence the House did not bother to wait for) confirmed that the "approximately $500,000" spent to renovate Justice Davis's chambers was *not* "unnecessary" spending—directly contrary to Article II.  If the House had some problem with the limited portion of expenditures that were not for structural renovations, it did not articulate any such concern in factual findings (which it did not enter).  Instead, Justice Davis was publicly charged with more than half a million dollars of "unnecessary" spending—when the House knew full well that the "vast majority" went to structural renovations that "had to be done."  (July 26, 2018 Tr. at 1341-42, 1367.)

**Senior Status Judges**.  Articles IV and V state that in her time as Chief Justice, Justice Davis violated her oath of office by approving "overpay[ments to] certain Senior Status Judges in violation of the statutory limited maximum salary for such Judges."  Again, however, the evidence before the House did not support any finding of a violation.

The West Virginia Constitution requires that "[t]here shall be at least one judge for each circuit court and as many more as may be necessary to transact the business of such court."  W. Va. CONST. Art. VIII, § 5.  In fulfillment of its duty to administer the courts, when exigent circumstances arise (*e.g.*, protracted illnesses, judicial suspensions, or other extraordinary circumstances), the Chief Justice may appoint Senior Status Judges to occupy vacant positions to preserve the fundamental right of the people to open courts.  Although there is a statutory cap on the total amount of compensation that may be made to Senior Status Judges, that statutory restriction cannot constrain the judiciary's constitutional authority.  The Court has to uphold its obligation under the Constitution to keep the courts running regardless of a statutory limit.  In keeping with this constitutional mandate, in 2017, then-Chief Justice Loughry issued an administrative order providing that "the chief justice has authority to determine in certain exigent

circumstances that a senior judicial officer may continue in an appointment beyond the limitations set forth in W. Va. Code § 51-9-10, to avoid the interruption in statewide continuity of judicial services" that is required under the Constitution.  Administrative Order No. 10, May 19, 2017.  This rule had the force of law—despite the statutory limit—under controlling West Virginia authority, which establishes that "the Supreme Court of Appeals shall have the power to promulgate rules for all of the courts," *Teter v. Old Colony Co.*, 441 S.E.2d 728, 741 (W. Va. 1994), and that "a statute that conflicts with [the Supreme Court of Appeals'] rule-making authority" is invalid, *State Farm Fire & Cas. Co. v. Prinz*, 743 S.E.2d 907, 916 (W. Va. 2013). In other words, to the extent that the West Virginia Code conflicts with the requirements of the West Virginia Constitution to maintain continuity in judicial services, the Chief Justice can and must enforce the Constitution.[3]

Thus, the supposed overcompensation of Senior Status Judges was only improper under West Virginia law if such Judges were compensated for periods when they were not necessary to ensure the public's access to the courts.  The House did not investigate that question, and no evidence submitted during the impeachment proceedings remotely supported any such finding. Once again, no facts support the Articles of Impeachment entered by the House.

***Inadequate Policies.***  Finally, Article XIV states that all four the Justices before the House collectively violated their oaths of office by failing to establish adequate policies with respect to spending and reporting of expenses.  (Ex. D.)  Article XIV contains no individualized allegations against any specific Justice, saying nothing whatsoever about how any action by

---

[3] The Audit Report that the House did not wait to review again confirms that Justice Davis's actions were proper.  The report states that "arguments can and have been made with respect to the legality of the Court's practice of allowing Senior Status Judges to exceed West Virginia Code's compensation caps," and that "circumvention of State law" could be "legally permissible . . . [as] a matter of last resort."  (Ex. E at 29.)

Justice Davis is supposed to have contributed to the Court's collective failure to put sufficient policies in place.  Indeed, the House once again did not bother to investigate the relevant facts.

Had the House undertaken even a minimal investigation, it would have discovered that Justice Davis voted numerous times during her tenure to improve reporting and accountability rules.  (Davis Decl. ¶ 5.)  But Justice Davis's position in favor of such policies was *voted down* when a majority of the other Justices disapproved them.  (*Id.*)  Remarkably, the House voted to adopt this Article of Impeachment without any evidence as to how Justice Davis or any other Justice voted with respect to spending and reporting policies.[4]  And what evidence the House did have reflected that Justice Davis "had some concerns" and "sent several memos" to Court staff inquiring about "proper reporting."  (July 12, 2018 Tr. at 90-91; *see also* July 26, 2018 Tr. at 1167 (in August 2016, Justice Davis "was concerned" about use of Court vehicles, questioned "if there were any kind of IRS issues," and "wanted it on the administrative conference agenda").)  A memo from Justice Davis to the Court's Administrative Director was in evidence before the Committee, requesting that various spending issues be raised at the August 31, 2016 Administrative Conference due to concerns about "auditing, budgeting, limiting expenses and transparency in all aspects of our Court family."  (Ex. H.)  Justice Davis would have happily testified to the relevant facts before the Delegates—just as she has repeatedly and consistently cooperated in State and federal investigations into these issues.  (Davis Decl. ¶ 4.)  *But neither the Judiciary Committee nor the House ever called her to testify.*  Indeed, as is clear from their actions, the Delegates had no interest in finding out what Justice Davis actually did, or whether

---

[4] Minority Chair Fleischauer identified this problem expressly before the Committee, noting that "Justice Davis did attempt to get this policy [related to spending restrictions] taken up by the Court," and the Committee didn't "know what the vote on—was on that."  (Aug. 7, 2018 Tr. at 2119-20.)

her conduct rose to the level of an impeachable offense.  The House entered Article XIV against Justice Davis without having seen any evidence to support it.

**B.      The Articles of Impeachment Are Procedurally Invalid.**

In addition to being factually unfounded, the Articles of Impeachment are legally flawed. One critical flaw—recognized as such by the Delegates before the ultimate vote was taken—is that the Judiciary Committee did not make any findings of fact in support of the Articles, or report any such findings of fact to the House, contrary to its duties under H.R. 201.

In June 2018, the House adopted H.R. 201, the resolution that established procedures for these impeachment proceedings and set forth the Judiciary Committee's "duties pursuant to this resolution."  Those "duties" include:

> (1) To investigate, or cause to be investigated, any allegations or charges related to the maladministration, corruption, incompetency, gross immorality, or high crimes or misdemeanors committed by any Justice of the West Virginia Supreme Court of Appeals;
>
> (2) To meet during the adjournment of the House and to hold a hearing or hearings thereon if deemed necessary in the course of its investigation;
>
> (3) *To make findings of fact based upon such investigation and hearing(s)*;
>
> (4) *To report to the House of Delegates its findings of facts* and any recommendations consistent with those findings of fact which the Committee may deem proper; and
>
> (5) If the recommendation of the Committee be to impeach any or all of the five members of the West Virginia Supreme Court of Appeals, then to present to the House of Delegates a proposed resolution of impeachment and proposed articles of impeachment;

H.R. 201, 83rd Leg., 2nd Spec. Sess. (W. Va. 2018) (emphasis added).

The requirement of findings of fact makes sense.  Such findings would permit the House of Delegates to assess whether the facts found by the Committee supported the extraordinary action of impeachment.  And findings of fact would provide notice to Justice Davis and her

colleagues of the charges against them before they were forced to stand trial in the Senate.  *See, e.g.*, *Bd. of Educ. of Cty. of Mercer v. Wirt*, 453 S.E.2d 402, 410 (W. Va. 1994) (due process requires "adequate written notice of the charges against [the individual] and an explanation of the evidence prior to" a hearing).

There can be no dispute, however, that the Judiciary Committee did not make findings of fact.  Nor did it report any findings of fact to the House.  As members of the Judiciary Committee and the House of Delegates observed, this was inconsistent with the duties imposed by H.R. 201:

> MINORITY CHAIR FLEISCHAUER: . . .  If we look at the Resolution that empowers this Committee to act, it—it says that we are to make findings of fact based upon such investigation and hearing and to report to the House of Delegates its findings of fact and any recommendations consistent with those findings, of which the Committee may deem proper . . . .
>
> And I'm just a little concerned that if we don't have findings of fact that there could be some flaw that could mean that the final Resolution by the House would be deemed to be not valid.

(August 7, 2018 Tr. at 2016-17.)  Other delegates agreed that failing to make findings of fact separate from the Articles of Impeachment was inconsistent with "the clear wording of House Resolution 201," in which "the findings of fact . . . are referenced separate from proposed Articles of Impeachment."  (*Id.* at 2014.)

Nonetheless, no findings of fact were made.  The Committee's failure may have been a consequence of the absence of evidence sufficient to make findings that could support the Articles of Impeachment, as detailed above.  But whatever the reason, the Committee's failure to fulfill its duties under H.R. 201 renders the Articles of Impeachment legally invalid.[5]

---

[5] The Articles of Impeachment are also invalid because the House failed to authorize them consistent with its obligation to deliver Articles "to the Senate in accordance with the procedures of the House of Delegates . . . ."  H.R. 201.  Because the House Judiciary Committee never adopted H.R. 202, the resolution of impeachment that was to have been presented to the House

### C.    Continuing Impeachment Proceedings Against Justice Davis—Who Has Retired from the Bench—Is Improper.

Even if the Articles of Impeachment were factually or legally sufficient to support a trial in the Senate, they cannot support any trial against Justice Davis.  The only judgment available on these Articles of Impeachment—under the House's own rules—is removal from office.  But Justice Davis has retired, and so no judgment can lawfully be rendered against her in the Senate.

Under Rule 12 of the Rules of Procedure for the House Committee on the Judiciary, which was adopted specifically for these impeachment proceedings, the "sole remedy available in an impeachment proceeding" is removal.  (Ex. F.)  Indeed, the Rule specifically provides that if an official under investigation retires, then proceedings as to that official are to cease: "Because the sole remedy available in an impeachment proceeding is the removal from office of an officer of the State, the resignation, retirement or some other act which effectively results in the removal of an officer who is a subject of the proceeding from his/her office eliminates the need for further evidence specifically referring to that official," and "no such evidence will be admitted."  (*Id.*)  Chairman Shott of the Judiciary Committee made the application of this rule clear, when he explained why there would be no impeachment proceedings as to Justice Ketchum:

> CHAIRMAN SHOTT:  . . .  [T]he only remedy that's available to the House as a result of this proceeding is to recommend articles of impeachment, and ***the only remedy available to the Senate is removal from office***.
>
> And because the retirement of Justice Ketchum effectively will result in his removal from office, we will not be spending any time dealing with the findings of any of the reports that deal with Justice Ketchum.

July 12, 2018 Tr. at 5 (emphasis added); *see also id*. at 11, 14-15 (same).

---

of Delegates, the full House had no resolution on which to vote.  Thus, when the House adopted H.R. 202, it did not do so in accordance with its own procedures, and the resolution presented to the Senate is procedurally infirm.

The Senate Rules adopted for these impeachment proceedings likewise provide that any Article of Impeachment sustained by the Senate *must* lead to a judgment of removal.  *See* Senate Rule 31(b) ("If two thirds of the Senators elected vote to sustain one or more Articles of Impeachment, a judgment of conviction and removal from office *shall be pronounced.*") (emphasis added).  Based on this, the Presiding Officer of the impeachment trials, Acting Chief Justice of the Supreme Court of Appeals Paul Farrell, questioned the pursuit of trial against Justice Davis.  (Ex. G ("The Presiding Officer noted that Robin Jean Davis had retired from the office of Justice," and that "the removal from office is the only punishment in an impeachment.").)  Following Justice Farrell's observation, Senator Trump moved to dismiss the proceedings against Justice Davis in light of her retirement—but the motion failed.  (*Id.*)

During the discussion on Senator Trump's unsuccessful motion, various Senators suggested that trial was warranted to determine whether judgments beyond removal should be imposed, including disqualification of Justice Davis from holding State office in the future or cancellation of Justice Davis's pension.[6]  But the House returned Articles of Impeachment that called only for the *removal* of Justice Davis—not disqualification from holding future office or denial of her pension—and thus the only judgment authorized under those Articles is a judgment of removal.  Likewise, the Senate Rules make clear that if these Articles are sustained, removal *must* follow.  Expanding the judgment to encompass disqualification is thus inconsistent with House and Senate Rules.  Moreover, Justice Davis had no notice that the charges against her exposed her to any judgment other than removal given the express Rules to the contrary.

---

[6] *See* Brad McElhinny, *Trial dates set for W.Va justices Loughry, Workman, Walker and Davis*, WV METRO NEWS (Sep. 11, 2018, http://wvmetronews.com/2018/09/11/updates-pretrial-hearing-in-wv-supreme-court-impeachment/).

14

The threat to Justice Davis's pension is improper for yet another reason.  The West Virginia Constitution is express that "[j]udgment in cases of impeachment shall not extend further than to removal from office, and disqualification to hold any office of honor, trust or profit, under the state."  W. Va. CONST. Art. IV, § 9.  Loss of a duly earned pension is not among the penalties that the West Virginia Constitution permits for impeachment.  Thus, although state law authorizes termination of pension benefits for "impeachment and conviction . . . except for misdemeanor," W. Va. Code § 5-10A-1, *et seq.*, that statute conflicts with the express terms of the Constitution, and is invalid.  Consistent with the State Constitution, the State cannot deny Justice Davis the pension benefits she has earned on the basis of Articles of Impeachment.

In sum, because Justice Davis has retired and cannot be removed, there is no valid judgment that the Senate can impose against her.  No further proceedings should be held.

### D.    The Articles of Impeachment and Senate Proceedings on Those Articles Violate Both the Federal and State Constitutions.

Neither the U.S. Constitution nor the West Virginia Constitution abides the abuse of power that Defendants have engaged in and continue to engage in here.  As detailed below, Justice Davis will establish that the factually and legally unfounded Articles of Impeachment and Senate trial thereon violate both the federal and State Constitutions.

***Due Process.***  Perhaps most glaringly, the impeachment proceedings do not satisfy due process requirements.  The Due Process Clause requires that state action that deprives an individual of a property or liberty interest "be preceded by notice and opportunity for hearing appropriate to the nature of the case."  *Tri Cty. Paving, Inc. v. Ashe Cty.*, 281 F.3d 430, 436 (4th Cir. 2002) (citing *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306 (1950)).  Thus, a plaintiff may prove a due process claim under § 1983 by demonstrating that (1) at the time of the

injury, she had a property or liberty interest protected by state law and (2) the state deprived her of that interest without due process of law. *Paul v. Davis*, 424 U.S. 693, 710-11 (1976).

There can be no doubt that Justice Davis holds a fundamental property interest in the pension she earned during her 22 years of service as a Justice. *See Dadisman v. Moore*, 384 S.E.2d 816, 828 (W. Va. 1988) ("The realization and protection of public employees' pension property rights is a constitutional obligation of the State."). She likewise holds fundamental liberty interests in her professional reputation and opportunities for future employment, including her opportunity to run for future office, which has been jeopardized by both the threatened unauthorized judgment of disqualification and the stigma attached to these impeachment proceedings. *See Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971) (due process rights attach "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to [her]"); *Sciolino v. City of Newport News*, 480 F.3d 642, 649 (4th Cir. 2007) ("A public employer who fires (or refuses to hire) an employee in a manner that sullies the employee's good name and restricts his future employment opportunities deprives him of important liberty interests protected by the Fourteenth Amendment."); *Dunn v. Town of Emerald Isle*, 918 F.2d 955 (4th Cir. 1990).

In light of these compelling constitutional interests, the process afforded to Justice Davis has been entirely inadequate to afford her the notice and hearing required to ensure due process of law. *See Speiser v. Randall*, 357 U.S. 513, 520-21 (1958) ("[T]he more important the rights at stake the more important must be the procedural safeguards surrounding those rights."); *see also State v. Hasty*, 63 So. 559 (Ala. 1913) (concluding that the "extraordinary remedy by [judicial] impeachment" is highly penal and is governed by rules of law applicable to criminal prosecutions). First, Justice Davis has been denied adequate notice of the nature and factual

grounds of the charges against her and the potential penalties for those charges.  For instance, in Article II, Justice Davis was charged with "unnecessary and lavish" spending on renovations to her chambers.  But no constitutional provision, statute, regulation, or any other provision provided Justice Davis notice of what constitutes impermissible "unnecessary and lavish" spending.[7]  *See Golson v. Green Tree Fin. Servicing Corp.*, 26 F. App'x 209, 215-16 (4th Cir. 2002) ("Fundamental to the due process analysis is whether the defendant received fair notice that the conduct in question was prohibited and what the potential penalty for engaging in that conduct could be.").

Moreover, the failure of the Judiciary Committee to return findings of fact—contrary to its rules—has left Justice Davis with no notice as to which expenditures could be deemed to support the supposed violation of her oath of office.  Likewise, Justice Davis was given no notice as to which payments to Senior Status Judges the House deemed unnecessary, or what facts support a determination that she (as distinct from any other Justice) is somehow responsible for the Court's insufficient spending and reporting policies.  *See Hamling v. United States*, 418 U.S. 87, 117-18 (1974) (accusation "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged").

Justice Davis also did not receive notice of the potential penalties she faced.  Indeed, not only was Justice Davis deprived of notice that she faced the risk of both disqualification and loss of her pension, but the published Judiciary Committee Rules (and Committee Chairman Shott) expressly stated *the opposite*—declaring that removal was the *only* possible judgment.  *Supra*,

---

[7] As Minority Chair Fleischauer inquired of counsel for the Judiciary Committee, "how can we know whether $100,000 of lavish spending, $300,000 or $500,000 is an impeachable offense when under the Constitution, they have the authority under their own budget?"  (Aug. 7, 2018 Tr. at 2166.)

p. 13-14.  This is contrary to "[e]lementary notions of fairness enshrined in our constitutional jurisprudence" that "dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 n.22 (1996) (citing cases).  When Justice Davis elected to retire and relinquish her right to the seat to which she was elected, she did so in reliance on the express Rules that indicated removal was the only penalty at issue.  But the Senate's actions have changed the rules.  This "unforeseeable and retroactive judicial expansion" of the charge against her violates the requirements of due process.  *Hamling*, 418 U.S. at 116.

***Separation of Powers.***  The impeachment proceedings are also invalid because they violate the West Virginia Constitution, which guarantees separation of powers and an independent judiciary.  The West Virginia Constitution provides that "[t]he legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others."  Art. V, § 1; *State ex rel. Barker v. Manchin*, 279 S.E.2d 622 (W. Va. 1981) ("Article V, section 1 of the Constitution of West Virginia which prohibits any one department of our state government from exercising the powers of the others, is not merely a suggestion; it is part of the fundamental law of our State and, as such, it must be strictly construed and closely followed.").  Thus, the West Virginia Constitution prohibits the legislature from undertaking judicial action or attempting to alter the powers constitutionally afforded to the judicial branch.  Art. V, § 1; Art. VIII, § 1; Art. VI, § 40; *see also State ex rel. Quelch v. Daugherty*, 306 S.E.2d 233, 235 (W. Va. 1983) (striking legislation that limited the Supreme Court's ability to control the process and standards for admission to practice law).  Defendants' efforts to impeach and remove *the entire remaining Supreme Court of Appeals* have flouted these constitutional principles of separation of powers and judicial independence.

18

First, the pending impeachment proceedings infringe on the judiciary's constitutional authority to establish and control its own budget, *see* Art. VI, § 51; Art. VIII, § 3, by penalizing the Justices for using budgeted funds to pay appointed Senior Judges and for renovations to the Supreme Court of Appeals—*i.e.*, the seat of the judiciary.  *See State ex rel. Frazier v. Meadows*, 454 S.E.2d 65, 71 (W. Va. 1994) (constitution "insulate[s] the judiciary from political retaliation by preventing the governor and legislature from reducing the judiciary's budget submissions"); *State ex rel. Brotherton v. Blankenship*, 207 S.E.2d 421, 431 (W. Va. 1973) (same). Significantly, as the audit report makes clear, the funds used to pay appointed Senior Judges and for renovations of the Supreme Court had been budgeted by and appropriated to the judiciary. (*See* Ex. E at 2, 8.)  The legislature's efforts to impeach every remaining Supreme Court Justice over their displeasure of how the independent judiciary used its properly budgeted and appropriated funds violates the West Virginia Constitution's protections for the independence of the judiciary.

Second, the impeachment proceedings infringe on the judiciary's plenary authority to regulate the practice of law and judicial conduct by purporting to impeach Justice Davis based on alleged violations of the Judicial Code of Conduct—for which the Judicial Investigation Commission has already investigated and cleared her.  The West Virginia Constitution gives the Supreme Court of Appeals exclusive authority to "promulgate and amend rules prescribing a judicial code of ethics, and a code of regulations and standards of conduct and performances for justices, judges and magistrates."  W. Va. CONST. Art. VIII, § 8.  The Constitution further provides that "No justice, judge or magistrate shall be censured, temporarily suspended or retired under the provisions of this section unless he shall have been afforded the right to have a hearing *before the supreme court of appeals*."  *Id.* (emphasis added).  As this provision establishes, the

19

judiciary has the exclusive authority to enforce the judicial code of conduct that it has established.  That authority is exercised by the Judicial Investigation Commission, which is the only governmental entity in West Virginia with authority to investigate violations of the judicial conduct rules.  Here, the Judicial Investigation Commission has already investigated Justice Davis and concluded that she *did not violate the Code of Judicial Conduct.*  (Ex. B.)  The legislature's efforts to inject itself into enforcement of the Judicial Code of Conduct—and to reverse the decision of the Judicial Investigation Commission—infringes on the judiciary's constitutionally conferred "power to protect the integrity of the judicial branch of government." *State ex rel. Carenbauer v. Hechler*, 542 S.E.2d 405, 419 (W. Va. 2000).

Finally, the charges exceed the legislature's constitutional authority of impeachment. The West Virginia Constitution guarantees elected Justices the right to retain their seats during their elected terms, with the sole exception of impeachment: the legislature may impeach Justices who engage in "maladministration, corruption, incompetency, gross immorality, neglect of duty, or any high crime or misdemeanor."  Art. IV, § 9; *see also* Art. VIII, §§ 7-8.  Even if the Articles of Impeachment as to Justice Davis had a basis in fact—which they do not—they would not allege conduct rising to the level of an impeachable offense as defined in the West Virginia Constitution.  Instead, these impeachment proceedings are a naked power grab by the political branches, and a clear violation of the separation of powers and judicial independence guaranteed by the West Virginia Constitution.

***Pretext.***  Finally, Justice Davis will prevail in establishing that the impeachment proceedings are entirely pretextual—and that the actions taken against her are in fact retaliation for her protected speech, gender discrimination, or both.  First, during the course of Justice Davis's candidacy for, election to, and service on the Supreme Court, she engaged in protected

speech that expressed her political views and opinions on numerous matters of public interest. *See Elrod v. Burns*, 427 U.S. 347, 356 (1976) ("[P]olitical belief and association constitute the core of those activities protected by the First Amendment."); *Rossignol v. Voorhaar*, 316 F.3d 516, 522 (4th Cir. 2003) (citation omitted) ("[T]he First Amendment has its fullest and most urgent application precisely to the conduct of campaigns for political office.").  The Defendants have adversely affected Justice Davis's First Amendment rights because they fabricated impeachment charges designed to remove her from elected office, which would deter an ordinary person from engaging in protected political speech.  *See Saleh v. Upadhyay*, 11 F. App'x 241, 255 (4th Cir. 2001); *Shepard v. Irving*, 77 F. App'x 615, 621 (4th Cir. 2003) (concluding that a concocted plagiarism charge that damaged plaintiff's reputation and cost her professional opportunities had an adverse effect on her First Amendment rights).  And the circumstances reveal that Defendants acted *because* of Justice Davis's political affiliation and expression.  The impeachment proceedings began when Governor Justice convened the legislature to further his desire to achieve a "conservative court."  Proceedings continued with entry of the Articles of Impeachment despite an utter failure to investigate or make findings as to key facts—and now Justice Davis is to stand trial at risk of a judgment (loss of her pension and disqualification) that is outside the authority of the Senate.  These facts establish that the impeachment proceedings constitute unlawful infringement of Justice Davis's First Amendment rights.  *See Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685-86 (4th Cir. 2000); *ACLU v. Wicomico Cty.*, 999 F.2d 780, 785 (4th Cir. 1993) ("Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights.").

The Defendants' pursuit of pretextual impeachment proceedings also violates Justice Davis's right to equal protection on the grounds of her gender.  *See Republican Party of N.C. v. Martin*, 980 F.2d 943, 953 (4th Cir. 1992) (government violates equal protection requirements by treating plaintiff dissimilarly to others similarly situated, where the state lacks adequate justifications for making such classifications).  The discriminatory intent of the legislature is clear from the fact that Defendants have pursued the impeachment and conviction of Justice Davis (female), but not Justice Ketchum (male)—even though both have retired.  Indeed, one notable distinction between the two is that Justice Ketchum has been convicted of criminal misconduct—whereas Justice Davis has not even been accused of criminal misconduct, and was found by the Judicial Investigation Commission not to have committed any violations of the Judicial Code of Conduct.  *See Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994) ("The equal protection clause confers a right to be free from gender discrimination that is not substantially related to important governmental objectives.").  The Defendants have no legitimate justification for pursuing impeachment trials against Justice Davis, and their persecution of her (along with her female colleagues) reflects intentional discrimination in violation of the equal protection clause.

### E.     The Defendants Have No Immunity For Their Bad Faith Acts.

Finally, Defendants cannot escape liability for their unprecedented sweep of the State's entire Supreme Court by asserting immunity.  As an initial matter, Governor Justice and the Clerks of the House and Senate are not entitled to assert sovereign or legislative immunity for their role in initiating and administering these unconstitutional impeachment proceedings.  *See Zimmeck v. Marshall Univ. Bd. of Governors*, 2013 WL 5700591, at *7 (S.D.W. Va. Oct. 18, 2013) ("[T]he Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law.") (citation omitted).  Moreover, although the House

and Senate Defendants ordinarily are immune for any legislative acts in which they participate in their role as legislators, *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998), their attempt to eject all popularly elected Justices in a clean sweep is not a legislative act entitled to such immunity.

Activities that are "political in nature rather than legislative" are not entitled to legislative immunity, because "it has never been seriously contended that [] political matters, however appropriate, have the protection afforded by the Speech and Debate Clause." *United States v. Brewster*, 408 U.S. 501, 512 (1972) (holding that the prosecution of a United States senator for unlawful conduct in exchange for an official act is not prohibited by legislative immunity). "Not all actions taken at a legislative meeting . . . are legislative for purposes of immunity." *Kamplain v. Curry Cty. Bd. of Comm'rs*, 159 F.3d 1248, 1251 (10th Cir. 1998) (holding that a Board's actions taken at a legislative meeting were not legislative, but administrative, in nature and not immune); *Brown v. Griesenauer*, 970 F.2d 431, 438 (8th Cir. 1992) (concluding that individuals sitting as a board of impeachment were not performing a legislative function and were not entitled to legislative immunity). Rather, "[w]hether an act is legislative turns on the nature of the act." *Bogan*, 523 U.S. at 54. By pursuing impeachment proceedings against the entire Supreme Court of Appeals without any basis in law or fact to do so, the House and Senate have not exercised their constitutionally prescribed duties as legislators. Instead, they have concocted prextextual charges in an unprecedented effort to knock out every popularly elected female Justice on the Supreme Court of Appeals—in a manner, that gives those Justices no recourse or opportunity for appeal as of right, as they otherwise would have if harmed by other legislative acts. The legislature has done so to permit Governor Justice to handpick conservative male replacements to serve on a "conservative court" for years to come. These proceedings, designed to eliminate the entire Court for political and discriminatory reasons, are not legislative acts.

They are an antidemocratic and unconstitutional farce that flies in the face of foundational constitutional principles.  The Court should not permit the Defendants to shield their destruction of core constitutional values behind legislative immunity.

## II.     JUSTICE DAVIS WILL SUFFER IRREPARABLE HARM IF THE INJUNCTION IS NOT GRANTED.

Because the impeachment proceedings violate the federal and State Constitutions, this Court should immediately enjoin the scheduled trial proceedings against Justice Davis in the Senate.  Each day that impeachment proceedings against Justice Davis are permitted to continue, she faces compounding irreparable harm to her reputation, as well as legal defense costs that cannot be recouped.  If a judgment is entered against Justice Davis in the Senate before she obtains judicial relief, those harms will multiply—in addition to the harm from whatever unlawful penalty the Senate may impose.  No money damages or other retrospective relief can possibly remedy this injury to Justice Davis's constitutional rights.  *See Marfork Coal Co. v. Smith*, 2010 WL 742560, at *5 (S.D.W. Va. Feb. 26, 2010) ("[I]rreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate.") (quoting *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co*., 22 F.3d 546, 551 (4th Cir. 1994)); *see also Henry v. Greenville Airport Comm'n*, 284 F.2d 631, 633 (4th Cir. 1960) ("The District Court has no discretion to deny relief by preliminary injunction to a person who clearly establishes by undisputed evidence that he is being denied a constitutional right.").

First, the harm to Justice Davis's reputation from these baseless impeachment proceedings is incalculable.  The shocking actions of the House in impeaching the entire remaining Supreme Court of Appeals has generated immense media attention, including in the

24

national press.[8]  Justice Davis has repeatedly been accused of corruption and abuse of power as a result of the unfounded and improper impeachment charges.  As long as the impeachment charges against her stand—and as long as the Senate continues its trial of her—the harms to her reputation will continue to grow, undermining the goodwill that she has built through more than two decades of service to the people of West Virginia.  *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 263 (4th Cir. 2017) (finding irreparable harm where the plaintiff's "reputation continues to be tarnished as questions about [alleged wrongdoing] continue to circulate"); *Robie v. Price*, 2017 WL 3097529, at *6 (S.D.W. Va. July 20, 2017) (finding irreparable harm where state action "create[d] a permanent black mark on [plaintiff's] reputation" because it caused substantial damage that "cannot be undone through retroactive payments"); *see also* 11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2948.1 (3d ed. 2018) (injury to reputation irreparable because it "is not easily measurable in monetary terms").

Justice Davis also suffers irreparable harm arising from the costs—both financial and personal—of withstanding an impeachment trial solely so that the Defendants can pursue legally unauthorized punitive and partisan attacks.  These harms—even the financial costs of her defense in the Senate—cannot be compensated with money damages at the conclusion of this litigation because the constitutional claims Justice Davis asserts do not entitle her to recover damages for

---

[8] *See, e.g.*, Isaac Stanley-Becker, *The Entire W.Va. Supreme Court Faces Impeachment for Alleged Corruption: Gas Money, Restaurant Lunches, an Antique Desk*, WASH. POST (Aug. 10, 2018, https://www.washingtonpost.com/news/morning-mix/wp/2018/08/10/gas-money-restaurant-lunches-an-antique-desk-the-entire-w-va-supreme-court-could-be-impeached-for-corruption/?noredirect=on&utm_term=.0dc9e52c5ce3); Brad McElhinny, *Justice Davis Announces Retirement from State Supreme Court, Amid Impeachment*, WV METRONEWS (Aug. 14, 2018, http://wvmetronews.com/2018/08/14/important-announcement-scheduled-at-supreme-court/); *W. Virginia Supreme Court Impeached Over Spending*, VALLEY NEWS (Sept. 30, 2018, https://www.vnews.com/Lavish-court-spending-in-poor-West-Virginia-triggers-scandal-19490188) (discussing "scandal").

the expense of defending herself in the Senate proceedings.  *See E.A. Hawse Health Ctr. v. Bureau of Med. Servs.*, 2011 WL 4528492, at *13 (S.D.W. Va. Sep. 28, 2011) ("[T]he unavailability of past money damages in federal court [under the Eleventh Amendment's bar on retroactive monetary damages] may warrant preliminary relief.").  Absent an injunction, Justice Davis will continue to bear heavy emotional, mental, reputational, and pecuniary costs for which she will not be adequately compensated when she ultimately prevails on the merits of her claims.

Finally, if the Senate actually enters judgment against Justice Davis, she will have no readily available opportunity for appeal—despite the clear invalidity of any such judgment. There is no court of appeals from which Justice Davis has a right to seek review of a Senate conviction on impeachment charges.  To the extent Justice Davis is able to procure relief following any unlawful Senate conviction, such relief will necessarily be extraordinary in light of the unprecedented nature of these proceedings.  Given the clear impropriety of the Senate proceedings against her, Justice Davis should not be placed at such risk of an unconstitutional deprivation of her right to seek future political office and her duly earned pension.  *See Faulkner v. Jones*, 10 F.3d 226, 233 (4th Cir. 1993) (affirming imposition of preliminary injunction based on a finding that irreparable harm caused by violation of constitutional right to equal protection was "crystal clear"); *Marietta Mem. Hosp. v. W. Va. Health Care Auth.*, 2016 WL 7363052, at *8 (S.D.W. Va. Dec. 19, 2016) ("Where a person's constitutional right will be denied if an action is allowed to continue, an irreparable harm will be established.").

## III.    THE BALANCE OF THE HARDSHIPS FAVORS THE INJUNCTION.

The Defendants have intentionally tarnished Justice Davis's reputation in pursuit of their own political goals.  They now seek to harass Justice Davis further by prosecuting her in the Senate without any factual or legal basis and to impose penalties that are not authorized by law. The substantial and irreparable harm that will befall Justice Davis should the Defendants proceed

with a trial on these pretextual impeachment charges far outweighs any purported injury the Defendants may assert from a delay in those proceedings.

As an initial matter, principles of federalism or state sovereignty do not bar this Court from intervening in state proceedings if necessary to protect the fundamental constitutional rights of United States citizens.  *See Larsen v. Senate of Pa.*, 152 F.3d 240, 247 (3d Cir. 1998) (rejecting state senators' argument that federalism prevented federal courts from interfering in state impeachment proceedings of a judicial officer).  Indeed, for precisely this reason, the courts have recognized an exception to sovereign immunity where "necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'"  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984) (citing *Ex Parte Young*, 209 U.S. 123 (1908)); *see also Gilliam v. Foster*, 75 F.3d 881, 904 (4th Cir. 1996) (en banc) (permitting federal courts to intervene in state criminal judgments to "vindicate . . . constitutional rights at the federal level").  Thus, any purported harm Defendants may assert arising from interference in a state political process does not prevent the Court from intervening to protect fundamental constitutional rights.

Further, in the unlikely event that the Defendants ultimately prevail on the merits, an injunction that temporarily prohibits them from moving forward with a Senate trial will cause no lasting harm.  Justice Davis already has retired.  Thus, the misconduct Defendants have charged to Justice Davis, even if it had any basis in fact (which it does not), no longer poses a threat to the people of West Virginia.  Indeed, Defendants have recognized the futility of proceeding with charges against a retired Justice because they chose not to charge Justice Ketchum, who was convicted of criminal charges after his retirement but has nonetheless not been impeached and will not be tried.  There is simply no compelling reason to rush to trial.  *See Faulkner*, 10 F.3d at

233 (issuing a preliminary injunction despite finding that it would "probably shake [defendant's] stability temporarily" because "no temporary adverse impact would be irreversible"). A preliminary injunction that postpones trial until after this Court resolves Justice Davis's constitutional claims will not harm Defendants, and is necessary to mitigate the severe harm that Justice Davis already has suffered and will continue to suffer from their unconstitutional attacks.

## IV.   THE PUBLIC INTEREST FAVORS THE INJUNCTION.

Finally, an injunction in favor of Justice Davis would serve the public interest in "upholding constitutional rights" and ensuring that the government complies with its constitutional obligations. *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013) (en banc) (citation omitted); *Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003). Defendants' attempt to sweep all popularly elected Justices from office and to replace them with conservative men handpicked by Governor Justice and his allies flies in the fact of the constitutionally mandated separation of powers and independence of the judicial branch. Art. V, § 1; Art. VIII, § 1; Art. VI, § 40. And it deprives all citizens of West Virginia of their constitutionally guaranteed right to elect the judicial officers serving on the State's highest court. The Court should grant preliminary injunctive relief to preserve the rule of law until a final determination of the important constitutional claims raised in this litigation.

## V.   WAIVER OF BOND IS APPROPRIATE.

This Court has discretion to waive the security requirements under Fed. R. Civ. P. 65(c), or require only a nominal amount. *Pashby*, 709 F.3d at 332 ("[T]he district court retains the discretion to set the bond amount as it sees fit or waive the security requirement") (citation omitted). Waiver of bond is proper when the "risk of harm" to the enjoined party, as here, is "remote." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 424 n.3 (4th Cir. 1999); *see supra* at Section III (arguing remote harm to Defendants). In noncommercial cases,

moreover, waiver is particularly fitting when the preliminary injunction seeks conformity to the

Constitution.  *See, e.g.*, *Doe v. Pittsylvania Cty.*, 842 F. Supp. 2d 927, 937 (W.D. Va. 2012)

(fixing bond at zero dollars because "there can be no monetary damages or other harm" when

requiring the defendant to abide by the Constitution).  The Court should therefore waive, or set at

a nominal amount, the security requirement.

## CONCLUSION

For the foregoing reasons, Plaintiff Davis respectfully requests that the Court grant a

preliminary injunction barring any impeachment trial proceedings against her in the West

Virginia Senate.

DATED: October 2, 2018

Respectfully submitted,

s/ Lonnie C. Simmons_____

J. Timothy DiPiero (W. Va. I.D. No. 1021)
Lonnie C. Simmons (W. Va. I.D. No. 3406)
DITRAPANO BARRETT DIPIERO MCGINLEY &
SIMMONS, PLLC
P.O. Box 1631
Charleston, WV 25326
(304) 342-0133
tim.dipiero@dbdlawfirm.com
lonnie.simmons@dbdlawfirm.com

James M. Cole*
SIDLEY AUSTIN LLP
1501 K Street, N.W. #600
Washington, D.C. 20005
(202) 736-8000
jcole@sidley.com
* *Pro hac vice* application pending

Tacy F. Flint**
Heather Benzmiller Sultanian**
John K. Adams**
One South Dearborn
Chicago, Illinois 60603
(312) 853-7000
tflint@sidley.com
hsultanian@sidley.com
john.adams@sidley.com
*Pro hac vice application forthcoming*

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 2, 2018, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF.  I certify that the foregoing document is being served

this day on all counsel of record via transmission of Notices of Electronic Filing generated by

CM/ECF.


s/ Lonnie C. Simmons
Lonnie C. Simmons