# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### at Charleston

**ROBIN JEAN DAVIS,**

      *Plaintiff,*

**v.**                        **Civil Action No. 2:18-cv-01316**
                                            **(Chief Judge Thomas E. Johnston)**

**JIM JUSTICE,** Governor**; ROGER HANSHAW,** Speaker of the West Virginia House of Delegates**; JOHN OVERINGTON,** Speaker Pro Tempore of the West Virginia House of Delegates**; DARYL COWLES,** Majority Leader of the West Virginia House of Delegates**; CHANDA ADKINS, GEORGE AMBLER, WILLIAM ANDERSON, MARTIN ATKINSON III, SAIRA BLAIR, BRENT BOGGS, JIM BUTLER, MOORE CAPITO, ROY COOPER, VERNON CRISS, MARK DEAN, FRANK DEEM, JOE ELLINGTON, PAUL ESPINOSA, ALLEN V. EVANS, ED EVANS, TOM FAST, MICHAEL FOLK, GEOFF FOSTER, CINDY FRICH, MARTY GEARHEART, DIANNA GRAVES, BILL HAMILTON, DANNY HAMRICK, JASON HARSHBARGER, KENNETH HICKS, JOSHUA HIGGINBOTHAM, JORDAN HILL, RAY HOLLEN, ERIC L. HOUSEHOLDER, GARY G. HOWELL, D. ROLLAND JENNINGS, JOHN R. KELLY, KAYLA KESSINGER, CHARLOTTE LANE, DANIEL LINVILLE, SHARON LEWIS MALCOLM, JUSTIN MARCUM, PATRICK MARTIN, ZACK MAYNARD, PAT MCGEEHAN, CAROL MILLER, RILEY MOORE, ERIC NELSON, JEFFREY PACK, TONY PAYNTER, RODNEY A. PYLES, BEN QUEEN, RALPH RODIGHIERO, MATTHEW ROHRBACH, WILLIAM R. ROMINE, RUTH ROWAN, JOHN SHOTT, KELLI SOBONYA, JOE STATLER, AMY SUMMERS, TERRI SYPOLT, JILL UPSON, DANNY WAGNER, GUY WARD, STEVE WESTFALL, BRAD WHITE, S. MARSHALL WILSON, MARK**

**ZATEZALO,** members of the West Virginia House of Delegates**;** **STEVE HARRISON,** Clerk of the West Virginia House of Delegates**;** **RYAN FERNS,** Majority Leader of the West Virginia Senate**; MIKE AZINGER, ROBERT D. BEACH, CRAIG BLAIR, GREG BOSO, CHARLES H. CLEMENTS, SUE CLINE, ROBERT L. KARNES, KENNY MANN, MIKE MARONEY, MARK R. MAYNARD, RICHARD OJEDA, PATRICIA RUCKER, RANDY SMITH, DAVE SYPOLT, TOM TAKUBO, JOHN R. UNGER II, RYAN WELD, MIKE WOELFEL,** members of the West Virginia Senate**; LEE CASSIS,** Clerk of the West Virginia Senate,

         *Defendants*.

---

## LEGISLATIVE DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

---

The Legislative Defendants,[1] by counsel, Lindsay S. See, Solicitor General, and Zachary Aaron Viglianco and Elizabeth D. Grant, Assistant Attorneys General, offer the following response in opposition to Plaintiff Robin Jean Davis' ("Plaintiff") Motion for a Preliminary Injunction.

## I.      Introduction

The West Virginia Constitution, like its federal counterpart, establishes that the West Virginia Legislature shall have the "sole power" to initiate and then try cases of impeachment.  W. Va. Const. art. IV, § 9.  *Cf.*  U.S. Const. art. I, §§ 2, 3.  The import of this textual command is clear: impeachment is an entirely Legislative endeavor.  *See Nixon v. United States*, 938 F.2d 239, 243 (D.C. Cir. 1991), *aff'd*, 506 U.S. 224 (1993) (marshalling historical evidence establishing that the "the framers [of the federal Constitution] simply assumed that courts had nothing whatever to

---

[1] All defendants named in this suit except Governor Justice.

do with impeachments" and that they "intended the impeachment power to be qualified only by political forces").

Plaintiff's request for a preliminary injunction must inevitably be dashed upon this rock. Whether it be because of the Defendants' invocation of Legislative immunity, application of the political question doctrine (or some other theory of nonjusticiability), or this Court's prudential abstention, Plaintiff has not and cannot establish a likelihood of success on the merits. In the absence of such a showing, no injunction shall issue. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009). Moreover, Plaintiff has not—and cannot—establish any of the other three factors (irreparable harm, a balance of the equities in her favor, and vindication of the public interest) that *Winter* mandates in order to obtain a preliminary injunction. Accordingly, this Court should deny Plaintiff's request.

## II.    Factual and Procedural Background

On August 7, 2018, the Judiciary Committee of the West Virginia House of Delegates ("the House") adopted Articles of Impeachment against Plaintiff—at the time a sitting Justice of the Supreme Court of Appeals of West Virginia ("the Supreme Court of Appeals")—along with the three remaining members of the Court.[2] Plaintiff was named in Articles II, IV, V, and XIV, which accused her of, *inter alia*, wasting state funds on renovating and remodeling her office, overpaying Senior Status Judges in violation of statutory limits, and neglecting her duty to adopt administrative

---

[2] Eric Levenson, *A West Virginia House panel has voted to impeach the entire state Supreme Court*, CNN POLITICS (Aug. 9, 2018), https://www.cnn.com/2018/08/09/politics/west-virginia-supreme-court-impeach-trnd/index.html. The fifth Justice, Menis Ketchum, resigned shortly before consideration of the proposed Articles of Impeachment began. *See id.* ("Justice Menis E. Ketchum II . . . retired from the court in late July . . .").

processes to detect and eliminate the waste of state funds.[3]  Late in the evening of August 13, 2018, the House voted to approve the Articles of Impeachment against Plaintiff.[4]  At a press conference held the very next day, Plaintiff announced that she was retiring from the Supreme Court of Appeals.[5]

The West Virginia State Senate ("the Senate") subsequently began its consideration of the Articles of Impeachment adopted by the House.  During floor debate, Senators discussed the propriety of continuing to pursue the Articles against Plaintiff in light of her resignation.  During that debate, several members expressed their view that continuing to pursue the Articles against Plaintiff was appropriate.  Specifically, several members expressed concern that, without a trial, Plaintiff's ability to collect her pension and serve as a senior status judge was uncertain.[6]  Ultimately, a Senator moved to dismiss Plaintiff from the Articles of Impeachment, pursuant to Senate Resolution 203,[7] which provides the procedural rules governing the impeachment trials.

---

[3] A certified copy of the Articles of Impeachment are available on the West Virginia Legislature's website.  The document may be accessed at http://www.wvlegislature.gov/legisdocs/committee/house/judiciary/certified_articles_of_impeachment.pdf. *See also* (ECF No. 12-8, at 16).

[4] Issac Stanley-Becker, *West Virginia House Votes to Impeach Entire State Supreme Court*, THE WASHINGTON POST (Aug. 14, 2018), https://www.washingtonpost.com/news/morning-mix/wp/2018/08/14/west-virginia-house-votes-to-impeach-entire-state-supreme-court/?noredirect=on&utm_term=.918e27e50755.

[5] During her press conference, Plaintiff declared that her resignation became effective on August 13, 2018—that is, before the Articles of Impeachment against her had been approved by the House.  For purposes of this motion, the exact moment that Plaintiff's resignation became effective is immaterial.

[6] *See* Brad McElhinny, *Trial dates set for W.Va. justices Loughry, Workman, Walker, and Davis*, WV METRO NEWS (Sept. 11, 2018), http://wvmetronews.com/2018/09/11/updates-pretrial-hearing-in-wv-supreme-court-impeachment/.

[7] S.R. 203, 83rd Leg. 2nd Spec. Sess. (W.Va. 2018), *available at* http://www.wvlegislature.gov/legisdocs/impeachment/SR203.pdf; *see also* (ECF No. 12-8 at 12.)

The Senate voted to deny this motion and thus to continue pursuing the charges against Plaintiff.[8]

On September 26, 2018, Plaintiff filed this suit, asking this Court, *inter alia*, to vacate the Articles

of Impeachment, find the impeachment trial proceedings in the Senate to be unlawful, and declare

Senate Resolution 203 invalid.   In support for her requested relief, Plaintiff advances four claims

pursuant to 42 U.S.C. § 1983, contending violations of her rights secured by the First and

Fourteenth Amendments to the federal constitution.   Plaintiff also sets forth two alleged violations

of the West Virginia Constitution.   On October 2, 2018, she filed the instant motion, which asks

this Court grant a preliminary injunction enjoining her scheduled impeachment trial. (ECF No.

12).   For the reasons set forth below, this Court should deny Plaintiff's request.

### III.     Argument

**A. Plaintiff is not entitled to a preliminary injunction because she cannot establish a likelihood of success on the merits.**

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter*,

555 U.S. at 24 (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)).   Instead, the decision to

grant or deny an injunction is "discretionary with the district court" provided the court applies the

appropriate legal standard.  *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 358 (4th Cir.

1991) *abrogated on other grounds by Real Truth*, 575 F.3d at 346.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter*, 555

U.S. at 20.  As the Fourth Circuit has explained in the wake of *Winter*, "all four requirements must

---

[8] *See* Order, In re: Matter of Impeachment Proceedings against Justices of the West Virginia Supreme Court of Appeals (entered Sept. 17, 2018), http://www.wvlegislature.gov/legisdocs/impeachment/Orders/Order_CourtofImpeachment_9-17-18.pdf.

be satisfied."  *Real Truth*, 575 F.3d at 346; *see also League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 249 (4th Cir. 2014) (Motz, J., dissenting) ("Critically, *each* of the[] four requirements [set forth in *Winter*] must be satisfied.") (emphasis in original).  Given that a plaintiff must establish all four factors, the failure to satisfy any single one provides a district court with sufficient grounds to refuse a request for an injunction.  *See Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 n.2 (4th Cir. 2011) (affirming denial of preliminary injunction where district court "limited its analysis to the first factor of *Winter*—plaintiffs' likelihood of success on the merits").[9]

Satisfying the most important *Winter* factor[10]—the first, likelihood of success on the merits—requires a heavy lift.  "[A] party seeking a preliminary injunction . . . must *clearly show* that it is likely to succeed on the merits."  *Dewhurst*, 649 F.3d at 290 (internal alterations omitted) (emphasis added); *see also*, e.g., *Douty v. Ballard*, No. 2:13-24714, 2014 WL 4297595, at *1 (S.D.W. Va. Aug. 29, 2014) (plaintiff seeking a preliminary injunction is "obliged to satisfy a rigorous burden").  As the Supreme Court explained in *Winter*, "[i]ssuing a preliminary injunction *based only on a possibility of irreparable harm* is inconsistent with our characterization of injunctive relief as an extraordinary remedy that *may only be awarded upon a clear showing* that the plaintiff is entitled to such relief."  555 U.S. at 22 (emphasis added).  The Fourth Circuit has

---

[9] *But see Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) ("Courts considering whether to impose preliminary injunctions must separately consider each *Winter* factor.").  *Contra Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) ("Because it is a threshold inquiry, when a plaintiff has failed to show the likelihood of success on the merits, we need not consider the remaining three [*Winter* elements].") (internal citations and quotation marks omitted).

[10] *See Garcia*, 786 F.3d at 740 ("The first factor under *Winter* is the most important—likely success on the merits."); *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) ("We begin with the first and most important factor: whether petitioners have established a likelihood of success on the merits.").

said (admittedly, in a case decided before *Winter*) that to satisfy this factor, a "plaintiff must have a very clear and strong case." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 813 (4th Cir. 1991) (citation omitted).  The *Direx Israel* court explained that in the context of preliminary injunctions, "to doubt is to deny" and thus, "if there is doubt as to the probability of plaintiff's ultimate success on the merits, the preliminary injunction must be denied." *Id.*

Plaintiff cannot clear this high bar.  First and foremost, the Legislative Defendants' are fully-cloaked in the shroud of absolute legislative immunity, which represents a complete and total defense to Plaintiff's claims.   Were this immunity was not enough, Plaintiff would still be unable to prevail because her claims are nonjusticiable—either because they raise a non-cognizable political question, the remedy would raise grave separation of powers concerns, or both.  And even if this Court determined the Legislative Defendants are not immune and plaintiff's claims are justiciable, she would not prevail because of the high likelihood that this Court would exercise its discretion to abstain from interfering in an ongoing State proceeding centered on important and complex questions of State law.

### 1. The Legislative Defendants are shielded from Plaintiff's claims by absolute legislative immunity.

"It is well established that federal, state, and regional legislators are entitled to absolute immunity from civil liability for their legislative activities." *Bogan v. Scott-Harris*, 523 U.S. 44, 46 (1998).  As the Supreme Court has noted on several occasions, legislative immunity has deep roots in Anglo-American jurisprudence; the doctrine is traceable to the common law privilege that developed to protect English Members of Parliament from interference with their official duties and serves as the historical antecedent of the "Speech or Debate" clause in the federal constitution[11]

---

[11] U.S. Const. art. I, § 6.

as well as the many analogous provisions found in State constitutions.[12]  *Id.* at 48; *Supreme Court of Virginia v. Consumers Union of U. S., Inc.*, 446 U.S. 719, 732 (1980) ("We have . . . recognized that state legislators enjoy common-law immunity from liability for their legislative acts, an immunity that is similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause."); *see also Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491, 502 (1975); *Doe v. McMillan*, 412 U.S. 306, 312 (1973); *Gravel v. United States*, 408 U.S. 606, 615-20 (1972); *Tenney v. Brandhove*, 341 U.S. 367, 372-76 (1951); *Kilbourn v. Thompson*, 103 U.S. 168, 201–05 (1880).

In *Tenney* the Court stated that legislative immunity exists to ensure that legislators can engage in the "uninhibited discharge of their legislative duty."  341 U.S. at 377.  The *Eastland* court, discussing the analogous protection provided by the Speech or Debate clause,[13] explained that "a private civil action, whether for an injunction or damages, creates a distraction and forces [legislators] to divert their time, energy, and attention from their legislative tasks to defend the litigation."  421 U.S. at 503.  The Court further noted that "[p]rivate civil actions also may be used to delay and disrupt the legislative function" and that when a "civil action is brought by private parties, judicial power is still brought to bear on [legislators] and legislative independence is imperiled."  *Id.*  Thus, immunity is extended so that "legislators acting within the sphere of

---

[12] *See*, e.g., W. Va. Const. art. VI, § 17; *see Tenney*, 341 U.S. at 375 (1951) (identifying forty-one State constitutions that contain provisions enshrining the principle that the "legislature must be free to speak and act without fear of criminal and civil liability.").

[13] *See Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967) ("the doctrine of legislative immunity [has] its roots . . . in the Speech or Debate Clause of the Constitution"); *United States v. Johnson*, 383 U.S. 169, 180 (1966) (noting that the "state legislative privilege [against Section 1983 suits is] on a parity with the similar federal privilege [set forth in the Speech or Debate clause]").

legitimate legislative activity [are] protected not only from the consequences of litigation's results but also from the burden of defending themselves." *Id.*

Against this backdrop, the *Bogan* court held that "[a]bsolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'" 523 U.S. at 54 (1998) (quoting *Tenney*, 341 U.S. at 376). "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Id.* Indeed, "[t]he privilege of absolute immunity 'would be of little value if [legislators] could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives." *Id.* (quoting *Tenney*, 341 U.S. at 377). *Cf. Powell v. McCormack*, 395 U.S. 486, 505 (1969) ("The purpose of the protection afforded legislators [by the Speech or Debate clause] is not to forestall judicial review of legislative action but to insure that legislators are not distracted from or hindered in the performance of their legislative tasks by being called into court to defend their actions.").

These principles make clear that the Plaintiff's claims must be dismissed because the Legislative Defendants are entitled to absolute immunity in impeachment proceedings. As the D.C. Circuit explained in *Nixon v. United States*, impeachment was explicitly designed and intended to operate as a *legislative* check on the executive and judiciary. 938 F.2d 239, 242 (D.C. Cir. 1991). Quoting Federalist No. 81, the D.C. Circuit repeated Alexander Hamilton's exhortation that impeachment was an "important constitutional check" designed to prevent "usurpations [against] the authority of the legislature" by the "members of the judicial department" as evidenced by the locating of "the power of instituting impeachments" in "one part of the legislative body" and the "determining [of the outcome of an impeachment] . . . in the other," *id.*, the same framework set forth in the West Virginia Constitution, *see* W. Va. Const. Article IV, § 9. As the

D.C. Circuit remarked, "Hamilton's emphatic language would have fallen rather flat if candor had compelled him to add that, of course, the judges themselves would sit in final judgment over this check on their excesses." *Nixon*, 938 F.2d at 242. Instead, "the Constitution's text, backed by . . . historical evidence" demonstrates that the framers of the federal constitution specifically intended to "prevent[] both the judiciary and the executive from constraining the legislative power of impeachment." *Id.* at 243.

This conclusion was reinforced when the Supreme Court affirmed *Nixon*. Noting that the constitution grants the United States Senate the "sole Power" to try impeachments, the Court said "[w]e think that the word 'sole' is of considerable significance." *Nixon v. United States*, 506 U.S. 224, 230 (1993). After reproducing the dictionary definition of sole as "functioning . . . independently and without assistance or interference," the Court explained that "[i]f the courts may review the actions of the Senate . . . it is difficult to see how the Senate would be 'functioning . . . independently and without assistance or interference." *Id.* The Court went on to say that "[a]uthority in the Senate to determine procedures for trying an impeached official, *unreviewable by the courts*, is therefore not at all inconsistent with authority in the President to grant a pardon to the convicted official." *Id.* at 232 (emphasis added). Finally, the Court echoed the D.C. Circuit's contention that "[t]he history and contemporary understanding of the impeachment provisions support our reading of the constitutional language." *Id.* at 233. The Court explained that there was not a "single word in the history of the Constitutional Convention or in contemporary commentary that even alludes to the possibility of judicial review in the context of the impeachment powers" and that "[t]his silence is quite meaningful in light of the several explicit references to the availability of judicial review as a check on the Legislature's power with respect to bills of attainder, *ex post facto* laws, and statutes." *Id.*

The majority of state courts that have considered the question have also reached the conclusion that impeachment is an inherently—and exclusively—legislative process. *See*, e.g., *Horton v. McLaughlin*, 821 A.2d 947, 949 (N.H. 2003) ("[I]mpeachment is 'exclusively a legislative prerogative.'") (quoting *In Re Mussman*, 289 A.2d 403 (N.H. 1972)); *Mecham v. Gordon*, 751 P.2d 957, 961 (Ariz. 1988) ("The text of the Arizona Constitution corresponds to the federal Constitution and is quite clear. The power of impeachment was not given to the judiciary . . . [r]emovals from office are not acts within the judicial power."); *Fairness & Accountability in Ins. Reform v. Greene*, 886 P.2d 1338, 1343 (Ariz. 1994) ("the power of impeachment [is] . . . peculiarly legislative and political") (citing *Mecham*, at 302); *State v. Chambers*, 220 P. 890, 892 (Okla. 1923) (the Oklahoma constitution "confers exclusive jurisdiction upon the Legislature and defines the duties of each house in cases of impeachment . . . [therefore] courts have no jurisdiction over nor power to interfere in cases of impeachment."); *State v. Dist. Court of Fifth Judicial Dist.*, 165 P. 294, 296 (Mont. 1917) ("[T]he power to remove an unfaithful or negligent public official is not essentially a judicial power. Under our Constitution, its exercise is left to the Legislature itself or to such other authority as the Legislature may designate."); *see also Forbes v. Earle*, 298 So. 2d 1, 4 (Fla. 1974); *In re Investigation by Dauphin Cty. Grand Ju*ry, 2 A.2d 802, 803 (Pa. 1938); *Ferguson v. Wilcox*, 28 S.W.2d 526, 533 (Tex. 1930); *State ex inf. Shartel v. Brunk*, 34 S.W.2d 94, 95-97 (Mo. 1930); *State v. Leese*, 55 N.W. 798, 799 (Neb. 1893); *State v. Ramos*, 10 La. Ann. 420, 422 (1855).[14]

---

[14] Furthermore, even some courts that have classified the impeachment power as "judicial" have nevertheless held that the Legislature's exercise of the power is exclusive and cannot be interfered with. *See*, e.g., *Ferguson v. Maddox*, 263 S.W. 888, 890-91 (Tex. 1924) ("The Senate sitting in an impeachment trial is just as truly a court as is this court. Its jurisdiction is very limited, but such as it has is of the highest. It is original, exclusive, and final. Within the scope of its constitutional authority, no one may gainsay its judgment."); *cf. People ex rel. McDonald v. Keeler*, 99 N.Y. 463, 480, 2 N.E. 615 (1885) ("To declare what the law shall be, is a legislative power; to declare

West Virginia has signaled its concurrence with this principle, with the Supreme Court of Appeals stating that "[u]nder our Constitution, *only the Legislature* has the power to remove a . . . judge from office, and it may do so only by impeachment."  *In re Watkins*, 233 W. Va. 170, 174, 757 S.E.2d 594, 598 (2013) (emphasis added); *see also Matter of Troisi*, 202 W. Va. 390, 395 n.6, 504 S.E.2d 625, 630 n.6 (1998) (observing that the West Virginia constitution "provides that the house of delegates shall have the sole power of impeachment of officials, and that the senate shall have the sole power to try impeachment of officials.").  Furthermore, the West Virginia Legislature has declared that a "Legislative act" is "an act that is generally to be performed by the Legislature in relation to the investigative, deliberative and decision-making business before it," W. Va. Code § 4-1A-3, and further provided that a legislative act "[r]elates to . . . matters that constitutional law places within the jurisdiction of either the Senate, the House of Delegates or the legislative branch of the state government as a whole," *id.* at (3).

The Supreme Court of Appeals' recent decision in *State ex rel. Workman v. Carmichael*, No. 18-0816, --- W. Va. --- (Oct. 11, 2018)[15] does not alter the fundamentally legislative character of impeachment proceedings in West Virginia.  *See SER Workman*, at *1 (Bloom, A. J., concurring) ("[W]e feel that it is imperative that we make clear that is our belief that the Legislature has *absolute authority* to impeach a judicial officer or any State public officer for wrongful conduct) (emphasis added); *see also id.* at *2 ("The [West Virginia] Constitution, Article IV, § 9, *invests absolute authority in the Legislature* to bring impeachment charges . . . and to prosecute

---

what it is or has been, is judicial. But notwithstanding this general division of powers, certain powers in their nature judicial are, by the express terms of the Constitution, vested in the legislature. The power of impeachment is vested in the assembly.").

[15]  The majority slip opinion is available at http://www.courtswv.gov/supreme-court/docs/fall2018/18-0816.pdf.  The partial concurrence, partial dissent of Acting Justices' Bloom and Reger is available at http://www.courtswv.gov/supreme-court/docs/fall2018/18-0816-con-bloom.pdf.

those charges . . . Courts around the country have long recognized that the Legislature has exclusive jurisdiction in impeachment matters or matters pertaining to impeachment of impeachable officers.) (quotation marks and citation omitted) (emphasis added). Even if there are rare instances where the judiciary may step in to ensure that the Legislature is not exercising its exclusive power in direct contravention to the textual commands of the constitution, *see Nixon*, 506 U.S. at 253-54 (Souter, J., concurring) (explaining that "if the Senate were to act in a manner seriously threatening the integrity of its results, convicting, say, upon a coin toss . . . judicial interference might well be appropriate"); *Workman*, at \*15-16 (majority op.), the prospect of highly-limited emergency corrective intervention—intended only to ensure the Legislature's fidelity to the text of the constitution—does not transform impeachment into a judicial exercise or otherwise excise impeachment's inherently legislative character.[16]

Once it becomes clear that impeachment is an "action taken in the sphere of legitimate legislative activity," the extension of legislative immunity to legislators acting in that role becomes

---

[16] Furthermore, it is important to note that the doctrine of legislative immunity—which exists in West Virginia both by statute, W. Va. Code § 4-1A-1 *et seq*, and in the West Virginia Constitution, W. Va. Const. Art. VI, § 17—was not specifically invoked in the recent *Workman* decision and its applicability (including whether or not it should have precluded the Court's consideration of the writ of prohibition) was not passed upon by the Supreme Court of Appeals. *See generally Workman*, No. 18-0816, --- W. Va. ---, *supra* n. 15. Of course, no decision of a state supreme court can displace federal precedent as to the appropriate scope of legislative immunity, especially with respect to the application of the doctrine to federal claims, like those advanced by Plaintiff pursuant under Section 1983. But beyond that, this Court should not read the *Workman* opinion to preclude application of legislative immunity to members of the West Virginia Legislature during impeachment proceedings, because the Supreme Court of Appeals made no such determination. Finally, this Court should be aware that the Legislative Defendants are considering further judicial review of the *Workman* decision, either by way of a Petition for Rehearing as permitted by Rule 25 of the West Virginia Rules of Appellate Procedure and/or by filing a Petition for Certiorari in the Supreme Court of the United States. *See*, e.g., Jacque Jo Bland (@jacquebland), Twitter (Oct. 11, 2018, 3:24 PM), https://twitter.com/jacquebland/status/1050467313328287747; Jacque Jo Bland (@jacquebland), Twitter (Oct. 11, 2018, 4:17 PM), https://twitter.com/jacquebland/status/1050480476706738176.

academic.  That Plaintiff has advanced federal constitutional claims or seeks only injunctive relief is of no moment; if anything, her resort to and primary reliance upon federal law makes it even more apparent that her claims are barred by legislative immunity.  *Tenney* expressly held that legislative immunity shields legislators from Section 1983 claims, like those advanced by the Plaintiff.  *Tenney*, 341 U.S. at 379 ("We conclude . . . that . . . the individual defendants and the legislative committee were acting in a field where legislators traditionally have power to act, and that [Section 1983] does not create civil liability for such conduct."); *id.* at 376; *see also Bogan*, 523 U.S. at 49 ("[W]e have held that state . . . legislators are entitled to absolute immunity from liability under § 1983 for their legislative activities.") (citing *Tenney*).  And, as the Supreme Court would go on to explain in *Consumers Union*, "[a]lthough *Tenney* involved an action for damages under § 1983, its holding is equally applicable to § 1983 actions seeking declaratory or injunctive relief."  446 U.S. at 732; *accord Scott v. Taylor*, 405 F.3d 1251, 1255 (11th Cir. 2005) (holding that "legislator defendants" subject to an "official capacity suit for prospective relief" were "entitled to absolute immunity"); *Larsen v. Senate of Com. of Pa.*, 152 F.3d 240, 251 (3d Cir. 1998) (legislators involved in impeachment proceedings "act within the sphere of legitimate legislative activity" and thus are "accorded legislative immunity."); *Star Distributors, Ltd. v. Marino*, 613 F.2d 4, 9 (2d Cir. 1980) (holding that "state legislators . . . are immune from suit under [Section] 1983 for injunctive relief as well as damages based on their activities within the traditional sphere of legislative activity").

The Third Circuit's decision in *Larsen* illustrates application of the doctrine to highly analogous facts.  There, Larsen, who, like Plaintiff, had served as a State Supreme Court Justice, filed a Section 1983 action in federal court against the State Senate and numerous individual state senators "for their role in his impeachment and removal from office."  *Larsen*, 152 F.3d at 243.

14

Larsen alleged a variety of constitutional claims, including violations of the First, Sixth, and Fourteenth Amendments and sought, *inter alia*, "declaratory and injunctive relief." *Id.* Noting that it "has long been settled that state legislators are also entitled to absolute legislative immunity from suit under § 1983 for legitimate legislative activities taken in their legislative capacities," the Third Circuit determined that extension of legislative immunity was appropriate as long as the state senators "performing their role in impeachment proceedings" were "acting in their legislative [capacity]." *Id.* at 249. After engaging in a review of both history and precedent, the court concluded that "impeachments are matters which the Constitution places within the jurisdiction of [the legislative branch]" and "represent a field where legislators traditionally have power to act." *Id.* at 251 (internal quotation marks and citations omitted). Accordingly, the court was "convinced that when legislators play the role they have been given in impeachment proceedings, they act . . . within their legislative capacities" and are entitled to absolute immunity. *Id.*

*Larsen's* holding applies with equal force here: The conduct Plaintiff challenges falls clearly within the Legislative Defendants' exercise of their *legislative* authority in service of a clearly *legislative* function—therefore they are entitled to absolute immunity for that conduct. Because this Court will ultimately conclude that the Legislative Defendants are protected by absolute legislative immunity, Plaintiff cannot demonstrate the likelihood of success on the merits necessary to obtain a preliminary injunction. Accordingly, this Court should deny Plaintiff's request and refuse to issue an injunction.

## 2. A collateral constitutional attack against an impeachment proceeding is not justiciable.

From the earliest annals of American history, it has been recognized that there are some questions, though they may have a direct and serious impact on an individual or his rights, which are nonetheless not appropriate for a court to resolve. *See Marbury v. Madison*, 5 U.S. (Cranch)

137, 166 (1803) (noting that "where the heads of departments are the political or confidential agents of the executive, merely to execute the will of the President, or rather to act in cases in which the executive possesses a constitutional or legal discretion, nothing can be more perfectly clear than that their acts are only politically examinable.").  Questions of this sort—those which should not be decided because of the "inappropriateness of the subject matter for judicial consideration," *Baker v. Carr*, 369 U.S. 186, 198 (1962)—are labelled nonjusticiable.

The most common class of nonjusticiable matters are political questions.  "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch. The Judiciary is particularly ill suited to make such decisions, as 'courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature.'" *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986) (quoting *U. S. ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1378 (D.C. Cir. 1981)).

Courts have often struggled with the exact parameters of the political question doctrine. *See Cannon*, 642 F.2d at 1379 (remarking that "the precise boundaries of the political-question doctrine are obscure").  Generally speaking, "the doctrine incorporates three inquiries: (i) Does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of Government? (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise? (iii) Do prudential considerations counsel against judicial intervention?" *Goldwater v. Carter*, 444 U.S. 996, 998 (1979) (Op. of Brennan, J.) (citing *Baker*, 369 U.S. at 217).  While answering these questions (or otherwise attempting to determine if a case qualifies as a political question) may, in many instances, be fraught with uncertainty, this case represents a rare instance in which a court can confidently declare that it has been presented with

16

a political question.  Given that this Court has no power to decide a nonjusticible question, it necessarily follows that Plaintiff cannot show a likelihood of success on the merits, and thus that she is not entitled to a preliminary injunction.

This Court can confidently declare that Plaintiff's case presents a political question because the Supreme Court has already held, in *United States v. Nixon*, that nearly all claims related to impeachment proceedings are nonjusticiable.  506 U.S. at 227, 238.[17]  *Nixon* involved a former United States District Judge's challenge to the procedures employed by the United States Senate during his impeachment trial.  *Id.* at 229.  As discussed in the previous section, the Court addressed at length the importance of the word "sole" in Article I, Section 3 of the federal constitution, ultimately concluding that this particular language demonstrated a "textually demonstrable constitutional commitment of the issue to a coordinate political department."  *See id.* at 228-236. The Court reinforced this conclusion by noting that "the difficulty of fashioning relief counsel[s] against justiciability."  *Id.* at 236.  Opening the door to judicial review, the Court said, "would expose the political life of the country to months, or perhaps years, of chaos." *Id.* (quotation marks

---

[17] The *Nixon* court did not foreclose a challenge where the Legislative branch "transgresses identifiable textual limits."  506 U.S. at 238.  The political question doctrine would not preclude judicial intervention intended to prevent or correct a Legislative body's blatant disregard for a constitutionally-mandated procedural stricture; for example, a removal predicated on a simple majority vote despite the federal constitution's unambiguous command that conviction and removal from office via impeachment requires "[c]oncurrence of two thirds of the [Senators] present."  U.S. Const. art. I, § 3.  *See Nixon*, 506 U.S. at 253-54 (Souter, J., concurring) ("If the Senate were to act in a manner seriously threatening the integrity of its results, convicting, say, upon a coin toss, or upon a summary determination that an officer of the United States was simply 'a bad guy,' judicial interference might well be appropriate.") (internal citation omitted).  *Cf. Kinsella v. Jaekle*, 475 A.2d 243, 253 (Conn. 1984) ("A court . . . may exercise jurisdiction over a controversy arising out of impeachment proceedings only if the legislature's action is clearly outside the confines of its constitutional jurisdiction to impeach any executive or judicial officer"). "In such circumstances, the Senate's action might be so far beyond the scope of its constitutional authority, and the consequent impact on the Republic so great, as to merit a judicial response despite the prudential concerns that would ordinarily counsel silence." *Nixon*, 506 U.S. at 254 (Souter, J., concurring).

omitted).  Moreover, the Court described as "[e]qually uncertain" the "question of what relief a court may give other than simply setting aside the judgment of conviction."  *Id.*  "Could it order the reinstatement of a convicted federal judge, or order Congress to create an additional judgeship if the seat had been filled in the interim?"  *Id.*  Though left unsaid, the Court almost certainly sought to imply that answering one or both of those questions in the affirmative would raise serious separation of powers concerns.  *Cf. Baker*, 369 U.S. at 210 ("The nonjusticiability of a political question is primarily a function of the separation of powers.").

The rationales that carried the day in *Nixon* are no less applicable here than they were in that case.  The provision of the West Virginia constitution outlining the impeachment power contains language virtually identical, in pertinent part, to its federal counterparts.  *Compare* W. Va. Const. art. IV, § 9 ("The House of Delegates shall have the sole power of impeachment. The Senate shall have the sole power to try impeachments and no person shall be convicted without the concurrence of two thirds of the members elected thereto.") *with* U.S. Const. art. I, § 2 ("The House of Representatives . . . shall have the sole Power of Impeachment.") *and* U.S. Const. art. I, § 3 ("The Senate shall have the sole Power to try all Impeachments . . . [a]nd no Person shall be convicted without the Concurrence of two thirds of the Members present.").  Thus, the *Nixon* Court's determination that questions concerning impeachment proceedings are textually committed to the Legislative branch ring equally true regardless of whether the branch to whom such questions are committed sits at the state or federal level.  Furthermore, *Nixon's* concerns with respect to redressability and the fashioning of a remedy are, if anything, amplified, when it is the judiciary of a *separate sovereign* that seeks to reach across the sacred chasm secured by the doctrine of separation of powers to substitute its will for that of a State Legislature acting within its constitutionally prescribed sphere.  *See* Section I.A.3, *infra*.

The idea that the federal judiciary is powerless to intervene—indeed even consider, much less ameliorate—in the face of alleged violations of indisputable federal constitutional rights may, at first blush, seem inconsistent with American jurisprudential tradition.  This Court should, however, heed the admonition articulated by the Supreme Court in *Tenney*.  Though he did not expressly invoke or rely upon the political question doctrine, Justice Frankfurter's majority opinion notes that "[i]n times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses." 341 U.S. at 378 (footnote omitted).  That sentiment is reflected and echoed in the historical analysis recounted by the D.C. Circuit's *Nixon* opinion, which noted that "[t]o check the impeachment power, the framers quite naturally relied on the political accountability of members of Congress. Thus judges, who on so many issues have the last word, must rely on the public as the ultimate check on impeachment, itself the Constitution's explicit check on their own excesses."  938 F.2d at 243; *see also id.* at 243 (concluding that the framers of the federal constitution "intended the impeachment power to be qualified only by political forces").

In sum, adherence to the Supreme Court's determination that nearly all questions concerning impeachment proceedings are nonjusticiable (and in the absence of the sort of blatant violation of a textual commands that would permit judicial intervention, like those recognized in Justice Souter's *Nixon* concurrence) demands that this Court refuse to address Plaintiff's claims because they raise a political question or otherwise are not subject to redress due to separation of powers concerns.  Accordingly, Plaintiff cannot demonstrate the requisite likelihood of success on the merits and is not entitled to a preliminary injunction.

**3. Even if this Court can exercise jurisdiction over Plaintiff's claims, it should decline to do so under the prudential doctrine of abstention.**

As a general rule, federal courts have a "virtually unflagging obligation" to exercise the jurisdiction given to them. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976); *cf. Cohens v. State of Virginia*, 19 U.S. 264, 404 (1821) ("It is most true that this Court will not take jurisdiction if it should not: but it is equally true, that it must take jurisdiction if it should."). Nevertheless, several exceptions to this general rule exist. *Colorado River*, 424 U.S. at 813 ("Abdication of the obligation to decide cases can be justified . . . [when it] would clearly serve an important countervailing interest."); *see also Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013) ("This Court has recognized, however, certain instances in which the prospect of undue interference with state proceedings counsels against federal relief."); *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) ("Th[e] duty [to exercise jurisdiction] is not, however, absolute."); *Canada Malting Co. v. Patterson S.S.*, 285 U.S. 413, 422 (1932) ("[T]he proposition that a court having jurisdiction must exercise it, is not universally true").

As the Supreme Court outlined in *Quackenbush*:

> [F]ederal courts have the power to refrain from hearing cases that would interfere with a pending state criminal proceeding, or with certain types of state civil proceedings; cases in which the resolution of a federal constitutional question might be obviated if the state courts were given the opportunity to interpret ambiguous state law; cases raising issues 'intimately involved with [the States'] sovereign prerogative,' the proper adjudication of which might be impaired by unsettled questions of state law; cases whose resolution by a federal court might unnecessarily interfere with a state system for the collection of taxes, and cases which are duplicative of a pending state proceeding.

517 U.S. at 717 (internal citations omitted). At least two of these exceptions are implicated in this case.

First, this Court should decline to intervene because the impeachment trial falls within the class of civil proceedings where *Younger* abstention is appropriate. *See Younger v. Harris*, 401

U.S. 37 (1971); *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423 (1982). Alternatively, this Court should abstain because the underlying impeachment proceedings are "intimately involved with the State's sovereign prerogative," *see Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959) and present "difficult questions of state law" the import of which "transcends the result in the case at bar," *see  Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). In such circumstances, either *Thibodaux* or *Burford* abstention may be appropriate.  Either way, to the extent this Court believes that Plaintiff's claims are both justiciable and not barred by legislative immunity, application of one of these doctrines counsel against reaching the merits of her claims.  Following such a course would necessarily result in Plaintiff being unable to demonstrate a likelihood of success on the merits, and thus would doom her request for a preliminary injunction.

### a.  Plaintiff's impeachment trial is an example of a proceeding for which *Younger* abstention is appropriate.

In *Younger v. Harris*, the Supreme Court, invoking and relying on fundamental principles central to "Our Federalism," explained that "the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions."  401 U.S. at 45. Although *Younger* was itself concerned with an injunction request targeting enforcement of a state criminal proceeding, the Court has since held that *Younger* is not confined to the realm of criminal prosecutions.   "The policies underlying *Younger* are fully applicable to noncriminal judicial proceedings when important state interests are involved."  *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982); *see also Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 11 (1987) ("This concern mandates application of *Younger* abstention not only when the pending state proceedings are criminal, but also when certain civil proceedings are pending, if the State's interests in the proceeding are so important that exercise of the federal judicial power would

21

disregard the comity between the States and the National Government.").  The *Middlesex* court explained that "*Younger* . . . and its progeny espouse a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances" and that "[m]inimal respect for the state processes, of course, precludes any *presumption* that the state courts will not safeguard federal constitutional rights."  457 U.S. at 432 (emphasis in original).  Moreover, "[i]t would trivialize the principles of comity and federalism if federal courts failed to take into account that an adequate state forum for all relevant issues has clearly been demonstrated to be available prior to any proceedings on the merits in federal court."  *Id.* at 437.

The Supreme Court recently explained that *Younger* abstention is appropriate when a non-criminal proceeding is "akin to a criminal prosecution in important respects."  *Sprint Commc'ns*, 571 U.S. at 79 (2013) (quotation marks and citation omitted).  Proceedings whose pendency warrant abstention under *Younger* are "initiated to sanction the federal plaintiff [that is, the target of the proceeding below] . . . for some wrongful act."  *Id.*  "A state actor is routinely a party to the [underlying] state proceeding and often initiates the action."  *Id.*  Finally, "[i]nvestigations are commonly involved, often culminating in the filing of a formal complaint or charges."  *Id.*

The impeachment proceedings (including the trial Plaintiff seeks to enjoin) fits neatly within this framework.  The Articles of Impeachment were issued after the House heard from witnesses and collected evidence concerning the behavior of the Justices of the West Virginia Supreme Court of Appeals, including Plaintiff.  The House, one half of the Legislative organ of West Virginia, is unquestionably a state actor.  And after hearing testimonial evidence, the House determined it was appropriate to return Articles of Impeachment—which could be colloquially be described as "charges" as they are functionally equivalent to what would be offered by a grand jury issuing an indictment—and, as such, the process is set to culminate with a determination of

those charges.  Thus, adherence to the framework set forth in *Sprint* would demand that this Court abstain from exercising jurisdiction over Plaintiff's claims.

### b.  Abstention is also warranted under either *Burford* or *Thibodaux* abstention.

Although there is some ambiguity as to exactly how many distinct abstention doctrines exist, *see* Wright & Miller, *Federal Practice & Procedure*, 17A Fed. Prac. & Proc. Juris. § 4241 (3d ed.) [hereinafter "Wright & Miller"] ("The Supreme Court has vacillated in its statements on how many abstention doctrines there are."); *see also*, e.g. *Grode v. Mut. Fire, Marine & Inland Ins. Co*., 8 F.3d 953, 956 (3d Cir. 1993) (naming five different abstention doctrines: *Pullman*, *Burford*, *Colorado River*, *Younger*, and *Thibodaux*), the general purpose animating those doctrines is clear: "Federal courts abstain out of deference to the paramount interests of another sovereign, and the concern is with principles of comity and federalism."  *Quackenbush*, 517 U.S. at 723.

Regardless of what name applies—whether it is called *Burford* or *Thibodaux* or they are one in the same[18]—this overarching principle is the driving force when a federal court chooses to abstain out of concern that the exercise of jurisdiction will result in unwarranted interference with complicated (and often unsettled) questions of State law, or otherwise touch upon a matter that is "intimately involved with [a] sovereign prerogative," *Thibodaux*, 360 U.S. at 28; *see also*, e.g., *Brooks v. Bd. of Educ.*, 2016 WL 8188562, at *17 (D.N.M. June 28, 2016) (State high court's

---

[18] *Compare Quackenbush*, 517 U.S. at 726-27 ("*Burford* allows a federal court to dismiss a case . . . if it presents difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar") *with Polygon Ins. Co. v. Honeywell Int'l Inc.*, 143 F. Supp. 2d 211, 213-14 (D. Conn. 2001) ("Pursuant to *Thibodaux* abstention, a federal court may refrain from exercising federal jurisdiction where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar.") (internal quotation marks omitted).  *See also*, e.g., *Starzenski v. City of Elkhart*, 842 F. Supp. 1132, 1138 (N.D. Ind. 1994) ("*Thibodaux* abstention is often considered a variation of *Burford* abstention."); *Jackson Nat'l Life Ins. Co. v. Quinones-Gonzalez*, 2014 WL 12726390, at *2 (D.P.R. Mar. 31, 2014) (discussing *Burford* and *Thibodaux* abstention in tandem).

determination as to the State's waiver of sovereign immunity is an example of interest "intimately involved with a sovereign prerogative"). As a leading treatise explains, "[t]he general thrust of *Burford*-type abstention can be well captured by saying that abstention is ordered in order to avoid needless conflict with the administration by a state of its own affairs." Wright & Miller, 17A Fed. Prac. & Proc. Juris. § 4244. Or, as the Supreme Court stated in *Martin v. Creasy*, this flavor of abstention reflects "the desirability of avoiding unseemly conflict between two sovereignties, the unnecessary impairment of state functions, and the premature determination of constitutional questions." 360 U.S. 219, 224 (1959).

It is hard to imagine an area more "intimately related" to West Virginia's sovereign prerogative than the legal propriety—indeed the constitutionality—of the procedures promulgated and then employed by the West Virginia Legislature during impeachment proceedings. And, as the recent opinion issued by the Supreme Court of Appeals concerning those procedures demonstrates, *see Workman*, *supra* n. 15, any judicial assessment (to the extent one is appropriate),[19] will necessarily involve a wide-ranging and particularized assessment of the West Virginia Constitution and a myriad of other state-specific authorities. While this Court certainly possesses the competence necessary to engage with those authorities, abstention is not a matter of familiarity—it is predicated on comity. This Court should not wade into this controversy out of deference to the political institutions in West Virginia—both judicial and legislative—which are charged with bringing to a satisfactory resolution this question of obvious public importance. In accordance with these principles, this Court should exercise its discretion to prudentially abstain. In the wake of such an abstention, there would be no doubt that Plaintiff's challenge cannot succeed on the merits and thus she would not be entitled to a preliminary injunction.

---

[19] *See* n. 24, *infra*.

**B. Plaintiff has not (and cannot) establish that she will suffer irreparable harm.**

The second *Winter* factor requires the party requesting an injunction to make a "'clear showing' that they are likely to be irreparably harmed absent preliminary relief." *Kelly v. City of Parkersburg*, 978 F. Supp. 2d 624, 627 (S.D. W.Va. 2013) (citing *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345 (4th Cir. 2009). The alleged injuries must be irreparable — "[m]ere injuries, however substantial, in terms of money, time, and energy expended in absence of the stay are not enough. . . . The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 89 (1974).[20] When considering the propriety of a request for a preliminary injunction, the court must consider whether the preliminary injunction will "remed[y] the alleged injuries. . . . [i]f the requested relief does not alleviate the alleged injuries, then refusal to grant that relief could not cause irreparable harm." *Marietta Mem. Hosp. v. W. Va. Health Care Auth.*, 2016 WL 7363052, at *8 (Dec. 19, 2016) (Johnston, J.,) (citing *Faulkner v. Jones*, 10 F.3d 226, 235 (4th Cir. 1993)).

Plaintiff asserts that if the impeachment trial is not enjoined, she will suffer irreparable harm in three ways: 1) harm to her reputation; 2) financial and emotional damage due to continued litigation; and 3) the inability for appellate review of a potential conviction. *See* Pl.'s Mem. in Supp. of Mot. For Prelim. Inj. 24–26; (ECF No. 13). Notably, Plaintiff does not identify the risk of losing her pension or the ability to run for public office as an irreparable harm because these alleged constitutional deprivations have not yet occurred and can only occur if the Senate convicts her in an impeachment trial.

---

[20] Although this decision was issued before the Court's opinion in *Winter*, the irreparable harm element in determining the necessity of injunctive relief is consistent with *Winter*.

This Court can easily dispense with Plaintiff's contention that the financial and emotional costs of an impeachment trial will cause irreparable harm. For instance, the Federal Circuit has held that a district court committed "legal error" when it factored-in litigation expenses while making a determination as to whether a plaintiff had suffered irreparable harm. *ActiveVideo Networks, Inc. v. Verizon Commc'n, Inc.* 694 F.3d 1312, 1337 (Fed. Cir. 2012) (holding that "[l]itigation costs are undoubtedly undesirable and may take funds away from other endeavors, but they are not an irreparable harm in the injunction calculus."). Thus, the legal expenses Plaintiff will likely incur in the absence of an injunction can have no impact on this Court's consideration of whether a preliminary injunction is warranted.

Nor can Plaintiff rely on the emotional toll she alleges that she has (and will continue to) suffer unless the impeachment trial is enjoined. *See* Pl.'s Declaration; (ECF No. 12-1 at ¶ 6). Pending litigation invariably results in an emotional and mental toll, to one degree or another, on every litigant. If such mental anguish and stress qualified as irreparable harm, then every litigant involved in judicial proceedings (including any state defendant-cum-federal plaintiff) would satisfy this factor, which would then be rendered superfluous. Such a holding would be directly inconsistent with the requirement that places the burden on movants to make a "clear showing" of such harm. *See City of Parkersburg*, 978 F.Supp.2d at 627.

Plaintiff's unadorned statement that her "reputation has been irreparably harmed" *See* Pl.'s Declaration; (ECF No. 12-1 at ¶ 6) is also insufficient to carry her burden, as a "showing of reputational harm must be concrete and corroborated, not merely speculative." *Trudeau v. Federal Trade Com'n*, 384 F.Supp.2d 281, 297 (D.C. Cir. 2005) (rejecting claim of reputational harm when plaintiff did not provide any evidence to support his claim); *see also Titaness Light Shop, LLC v. Sunlight Supply, Inc.*, 585 F. App'x 390, 391 (9th Cir. 2014) ("To establish a likelihood of

26

irreparable harm, conclusory or speculative allegations are not enough."). Plaintiff relies on *Robie v. Price*, No. 2:17-cv-03089, 2017 WL 3188572 (S.D. W.Va. July 26, 2017), to support her assertion that reputational harm can be irreparable. But, in *Robie*, the court found that the plaintiff satisfied his burden to clearly show reputational harm because the plaintiff demonstrated that, without the injunction, he would lose his staff appointment and peer elected position at a hospital, and he would be required to report the revocation when reapplying for clinical privileges. *Id.* at *7. Here, Plaintiff has not alleged, and certainly has not established, that she will suffer reputation harms as significant as those demonstrated by the plaintiff in *Robie* that warranted an injunction.

On the contrary, the impeachment trial actually provides Plaintiff an avenue by which to remedy her purported reputational harm. The trial procedures adopted by the West Virginia Senate provide her ample opportunity to rebut the purportedly "baseless" charges against her. As outlined in Senate Resolution 203, the House Managers[21] bears the "the burden of proof as to all factual allegations." S.R. 203 ¶ 18. Plaintiff is permitted to seek discovery of all evidence the House intends to introduce as evidence, and Plaintiff is entitled to cross-examine any witness called by the House. *Id.* at ¶¶ 20–21. To the extent Plaintiff has suffered reputational harm as a result of her impeachment, the only *legal* method of remedying that harm is to proceed with the removal proceedings. Enjoining—and thus delaying—her trial only exacerbates any reputational harm she has already suffered and delays her opportunity to seek vindication. *Cf. United States v. Alvarez*, 567 U.S. 709, 727 (2012) (Kennedy, J., plurality op.) ("The remedy for speech that is false is speech that is true. This is the ordinary course in a free society. The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth.").

---

[21] That is, the "members of the House of Delegates authorized by that body to serve as prosecutors before the Senate in a trial of impeachment." Senate Resolution 203, *supra* n. 7.

Finally, Plaintiff claims that she will suffer irreparable harm in the absence of a preliminary injunction because she is precluded from seeking appellate review if convicted by the West Virginia Senate. Yet, Plaintiff's suggestion that the unavailability of appellate review constitutes irreparable harm misses the mark for three reasons. First, it implies that simply being subjected to the impeachment trial is, *by itself*, an irreparable harm. But being compelled to participate in adjudicatory or investigative process is commonplace in both our judicial system and representative government (as undertaken regularly by the Legislative branch); only in extraordinary cases does mere participation warrant judicial intervention. *See*, e.g., *Dombrowski v. Pfister*, 380 U.S. 479 (1965). Second, Plaintiff's contention puts the cart before the horse because it presumes that she will *need* to appeal, that is, that the outcome of the impeachment trial is preordained. One need only look at the outcome of the impeachment trial of Justice Walker to see that is not the case.[22] *Cf. Trudeau*, *Titaness*, *supra*; *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."). Finally, Plaintiff's claim implies that she is entitled to appellate review. For the reasons discussed in Section I.A.1, *supra*, no such entitlement exists, as impeachment is an entirely legislative (rather than judicial) process, over which the Senate has final and absolute authority. Indeed, the *Workman* court expressly held that no appellate jurisdiction lies in a case of impeachment. Syl. pt. 1, *Workman*, No. 18-0816, --- W. Va. --- ("In the absence of legislation providing for an appeal in an impeachment proceeding under Article IV, § 9 of the Constitution of West Virginia, this Court does not have jurisdiction over an appeal of a final decision by the Court of Impeachment."). Regardless of the intrinsic merit of the

---

[22] *See* Brad McElhinny, *Senators acquit Justice Walker on impeachment charge*, WV METRO NEWS (Oct. 2, 2018), http://wvmetronews.com/2018/10/02/senators-acquit-justice-walker-on-impeachment-charge/.

*Workman* decision, that conclusion is entirely consistent with Supreme Court precedent, which has long held that States do not offend due process when they rely on the competency of their trial courts and decline to provide a forum for appellate review.  *See*, e.g., *Ross v. Moffitt*, 417 U.S 600, 606 (1974) ("[A] State is not obliged to provide any appeal at all for criminal defendants.") (citing *McKane v. Durston*, 153 U.S. 684 (1894)); *see also Billotti v. Dodrill*, 183 W.Va. 48, 52, 394 S.E.2d 32, 36 (1990).  Thus, so long as the trial level forum gives the accused a full and fair opportunity to present her case and defend herself, the unavailability of an appeal simply does not harm the Plaintiff.

The burden of establishing irreparable harms falls entirely on the Plaintiff.  She has not met that burden.  Accordingly, she is not entitled to a preliminary injunction.

**C.  The balance of equities does not favor Plaintiff.**

The third factor Plaintiff must satisfy in order to demonstrate an entitlement to an injunction is that "the balance of equities tips in [her] favor."  *Winter*, 555 U.S. at 20.  This requires a reviewing court to "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Id.* at 24 (internal citations and quotations omitted).  When analyzing the balance of equities, courts should consider whether the parties have other means to avoid alleged harm.  *See*, e.g.*, Sampson v. Murray*, 415 U.S. 61, 89 (1974) (directing courts to examine whether plaintiff will be afforded "corrective relief . . . in the ordinary course of litigation"); *City of Parkersburg*, 978 F.Supp.2d at 627 (S.D. W.Va. 2013) (finding that city had other enforcement means to address safety concern posed by injunction).

There is at least one other such avenue open to Plaintiff.  Despite her assertion that the impeachment trial procedures are deficient, Plaintiff has failed to raise any of the claims advanced in this case directly in the ongoing impeachment proceeding.  Under S.R. 203, Plaintiff may file

pre-trial motions, which other justices facing impeachment, including Chief Justice Workman and Justice Walker, have done.[23] *See Lynch v. Snepp*, 472 F.2d 769, 776 (4th Cir. 1973) (reversing preliminary injunction of state court proceedings, in part, because "requiring the plaintiffs to first seek vindication of their rights in the pending state court proceeding will not expose them to the risk of possible loss of liberty.") Nor has Plaintiff attempted to seek relief in the Supreme Court of Appeals West Virginia, which, as the final arbiter of questions of West Virginia law and the ultimate authority with respect to interpretation of the West Virginia Constitution, is (to the extent any judicial intervention is warranted) the more appropriate forum for seeking review of the procedures governing the impeachment process and/or bringing a constitutional challenge to that process as it has been employed.[24]

In contrast, were an injunction granted, the Legislative Defendants could be forced to schedule Plaintiff's impeachment trial during the regular legislative session, which will invariably distract from the pursuit of their lawmaking and other regular business. Because the West Virginia Legislature is a part-time citizen's Legislature, its members only meet once a year for approximately seven weeks (unless the Governor proclaims a special session). W. Va. Const. art. VI, § 18,19. Therefore, enjoining the impeachment trial will lead to one of two results: either the

---

[23] The pre-trial motions filed by each Justice and the responses thereto are available on the West Virginia Legislature's website http://www.wvlegislature.gov/impeachment_documents.cfm.

[24] Indeed, Chief Justice Workman filed a writ of prohibition with the Supreme Court of Appeals and the Court recently granted her writ, declaring several of the Articles of Impeachment issued against her to be invalid. *Workman*, No. 18-0816, --- W. Va. ---, *supra* n. 15. The Legislative Defendants **do not concede—and nothing in this response should be construed to suggest—** that the Supreme Court of Appeals (or any other court) has jurisdiction to interfere with the West Virginia Legislature's exercise of its "sole power" of impeachment, which is textually committed to the Legislature by the West Virginia constitution. However, if any court were to have jurisdiction to discuss and rule upon the parameters of West Virginia's impeachment power, it should be a court exercising the judicial power of the State of West Virginia, not the court of a separate sovereign.

West Virginia Senate will be forced to conduct the trial during its regular session, or it will need to call its part-time members away from their everyday careers and vocations at a time when the Legislature is not otherwise scheduled to meet in order to complete the trial.  The former threatens to stifle legislative progress and frustrates the expressed will of the people of West Virginia; the latter prolongs what has already been an extended process, is disruptive to the regular functioning of the Legislature, and imposes an unnecessary burden on the Legislative Defendants.

Weighing these potential harms reveals that the scale tips in favor of the Legislative Defendants.  Plaintiff's alleged harms are not irreparable: her claim of reputational harm is unsupported, her claims of financial and emotional harm are either not cognizable or insufficient to sustain a request for injunctive relief, and her argument that she is harmed by the absence of appellate review is legally unfounded.  In contrast, the Legislative Defendants must either allow a significant portion of their already limited legislative session be consumed by an impeachment trial or return at some uncertain future date, pulled away from their everyday vocations (many of whom reside many hours away from the State Capitol) in order to complete the impeachment trial. Thus, the third *Winter* factor counsels against the issuance of injunctive relief.

**D.  The public interest weighs in favor of denying the request for injunction.**

Lastly, a court considering whether or not to issue an injunction must consider the public interest.  *Winter*, 555 U.S. at 23-24.  In *Winter*, the Supreme Court noted that reviewing courts should "pay particular for the public consequences in employing the extraordinary remedies of an injunction'" *Id.* at 24.  Here, there can be no question that the public interest would be frustrated by the issuance of an injunction and vindicated by its denial.

Both the Legislative Defendants and the members of the general public whom they serve have clear and deeply-rooted interest in ensuring that the impeachment power set forth in the West

Virginia constitution is neither diluted nor interfered with.  The impeachment process is one of the few—and arguably the most important—check on the power of the judiciary.  *See Nixon*, 506 U.S. at 233 (1993); *see also Nixon*, 938 F.2d at 242 ("Hamilton identified the impeachment power as *the* basis for constraining usurpation by judges") (emphasis in original).  Interference with a check by the branch of government that is being checked undermines the beautifully-crafted system of government laid forth by the Founders of both the United States and West Virginia.  *See Nixon*, 938 F.2d at 242-43.  Furthermore, there can be no doubt that the citizenry of West Virginia has a pressing interest in resolution of the articles of impeachment instituted by their elected representatives; delay—such as the issuance of an injunction by this Court—would only serve to frustrate the popular will and leave hanging over the State of West Virginia a cloud of suspicion, with deleterious effects to the public and all the parties involved in this action.  Thus, it could hardly be clearer that the public interest favors the Legislative Defendants and against the issuance of a preliminary injunction.

## IV.    Conclusion

This Court should deny Plaintiff's motion and refuse to issue a preliminary injunction.

Respectfully submitted,

THE LEGISLATIVE DEFENDANTS
*Defendants*

By counsel,

PATRICK MORRISEY
ATTORNEY GENERAL

LINDSAY S. SEE
SOLICITOR GENERAL

[/s] Zachary Aaron Viglianco
ZACHARY AARON VIGLIANCO
ELIZABETH D. GRANT

ASSISTANT ATTORNEYS GENERAL
Office of the West Virginia Attorney General
State Capitol Complex,
Building 1, Room E-26
Charleston, WV 25301
Telephone: (304) 558-2021
WV State Bar ID# 12579
Email: zav@wvago.gov
*Counsel for the Legislative Defendants*

# CERTIFICATE OF SERVICE

I, Zachary Aaron Viglianco, do hereby certify that on October 12, 2018, I caused a true copy of the foregoing "***Response in Opposition to Plaintiff's Motion for a Preliminary Injunction***" to be served on the Clerk of Court and all parties electronically via the CM/ECF system.

/s/   *Zachary Aaron Viglianco*
ZACHARY AARON VIGLIANCO
ASSISTANT ATTORNEY GENERAL
Office of the West Virginia Attorney General
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
Telephone: (304) 558-2021
WV State Bar ID# 12579
Email: zav@wvago.gov
*Counsel for the State of West Virginia*